The United States, Plaintiffs in error, *v.* Joseph Reynes.

The act of Congress of May 26, 1824 (4 Stat. at Large, 52), for enabling claimants to lands within the limits of the State of Missouri and Territory of Arkansas to institute proceedings to try the validity of their titles, and which was revived by the act of June 17th, 1844 (5 Stat. at Large, 676), did not embrace within its operation complete or perfect titles to land.

It applied to incomplete titles only, derived either from Spanish, French, or British grants, and of these provided for such only as had been legally issued by a competent authority, and were protected by treaty.

The act, as revived and reenacted as aforesaid, was not designed to invest the holders of imperfect titles with new or additional rights, but merely to provide a remedy by which legal, just, and *bonâ fide* claims might be established.

The treaty of St. Ildefonso, between Spain and the French Republic, and that of Paris, between France and the United States, should be construed as binding on the parties thereto, from the respective dates of those treaties.

Upon no plausible pretext could it be denied that the treaty of St. Ildefonso was obligatory upon Spain from the period of her acceptance of the provision made for the Duke of Parma, in pursuance of that treaty, viz. on the 21st of March, 1801, or from the date at which she ordered the surrender of the Province of Louisiana to France, viz. on the 15th of October, 1802.

A grant by Morales, the Spanish governor, issued on the 2d of January, 1804, for lands included within the limits of Louisiana, was void; Spain having parted with her title to that Province to France, by the treaty of St. Ildefonso, on the 1st of October, 1800; and France having ceded the same Province to the United States by the treaty of Paris of the 30th of September, 1803.

Such a grant could not be protected by that article of the treaty of Paris which stipulated for the protection of the people of Louisiana in the free enjoyment of *their liberty and property;* the term *property,* in any correct acceptation, being applicable only to possessions or rights founded in justice and good faith, and based upon authority competent to their creation.

The circumstance, that the Spanish authorities retained possession of portions of Louisiana till the year 1810, did not authorize the issuing of grants for land by those authorities, upon the ground that they constituted a government *de facto,* Spain having long previously ceded away her right of sovereignty, and her possession subsequently thereto having been ever treated by the United States as wrongful, viz. after October, 1800.

The decisions of this court in the cases of Foster and Neilson, and Garcia and Lee, sustaining the construction of the political department of the government upon the question of the limits of Louisiana, reviewed and confirmed.

This was an appeal from the District Court of the United States for the District of Louisiana.

On the 10th of December, 1803, the following certificate of survey was issued : —

" I, Don Vincente Sebastian Pintado, captain of militia cavalry and deputy surveyor of this Province, do hereby certify, that there has been measured and the boundaries marked of a tract of land for Don José Reynes, containing 40,000 superficial arpents, measured by the perch of the city of Paris, of 18 feet of said city, calculating 100 superficial perches to the arpent, according to the agrarian custom of this Province, which tract is situated 4⅓ miles to the south of the boundary-line between the domains of his Majesty and the United States of America,

bounded on the north by lands belonging to Don Jame Jorda, Don Manuel de Sanzos, and on all the other sides by vacant lands, the River Comite, and a branch of said river, commonly called Canaveral Creek, passing in the centre of said tract, all of which are clearly described in the preceding plan signed by me, in which plan said tract is represented with the dimensions of its boundaries in lineal perches of Paris, the directions of the boundaries by the compass, the declination or variation of which is in the direction northeast, the trees and mounds intended as landmarks, and all other natural and artificial limits. The said 40,000 arpents were bought by the interested party from the royal treasury, and were ordered to be measured and appraised by a decree of the General Intendancy of this Province, under date of the 1st of September last, sent to Carlos de Grandpré, colonel of the royal armies, civil and military governor of the post of Baton Rouge and of its dependencies, and sub-delegate of the General Intendancy, who notified me of said decree, and of its contents.

" And said Excellency, the governor and sub-delegate, having appointed Don Pedro Allen and Don Felix Bernardo Dumontier appraisers on behalf of the government, and the agent of the party, Don Antonio Gras, having named Don Philipe Hickey and Don Bernardo Dubrocar, said gentlemen being assisted by two witnesses, to wit, Don Thomas Valentin Dalton and Juan Poret, appraised the aforesaid tract at the price and sum of six thousand dollars, or at the rate of fifteen cents per superficial arpent; the agent of the party, being informed of said appraisement, consented and approved it, receiving said tract as purchased, acknowledging the delivery thereof; and, with the appraisers and witnesses, signed these presents in Baton Rouge, on the 19th day of the month of November, of the year 1803.

(Signed,)                    ANTONIO GRASS,
                             VINCENTE SEBASTIAN PINTADO,
                             PEDRO ALLEN,
                             FELIX BERNARDO DUMONTIER,
                             PHILIP HICKEY,
                             BERNARDO DUBROCAR,
                             VN. DALTON,
                             JUAN PORET.

" The foregoing plan and explanations, or description, have been registered, in the office of general measuration, in book D, No. 4, folio 84, and the plan numbering 1672.

" 10 December, 1803.  Signed by me as Surveyor-General.

The United States *v.* Reynes.

" I certify that the foregoing is a correct copy of the original filed with the documents of the case, and I give the present in virtue of a decree from the Intendant-General, dated 6th of the present month of December, dated as above.
    (Signed,)               Carlos Trudeau,
                                      *Surveyor-General.*"

On the 2d of January, 1804, the following grant was made : —

" Don Juan Ventura Morales (*contador de exercito*), comptroller for the army, intendant and superintendent *pro tempore* of the Province of West Florida, minister commissioned with the adjustment and final settlement of the affairs of the royal *hacienda* (domains) in the Province of Louisiana. Whereas Don José Reynes, an inhabitant and merchant of this city, has presented himself before this tribunal, soliciting to purchase from the royal treasury 40,000 superficial arpents of land, of those vacant and belonging to the crown, the value of which he offers to pay, under appraisement, in letters of credit, issued by the department of the royal treasury, I ordered, in consequence of said demand, that a certified copy should be furnished by the secretary of the official letter addressed by this intendancy to the commissioners appointed for the transfer of this Province, on the subject of a petition presented by Don Thomas Urquhart, and of the answer made by said commissioners ; and that these be submitted to the Sen'r Fiscal (solicitor of the crown). Those formalities having been fulfilled, and no opposition being made to said petition from the answer given by said Sen'r Fiscal, whose opinion was favorable thereto, and who recommended that an order be issued to Colonel Carlos de Grandpré, governor and sub-delegate of the royal treasury in Baton Rouge, to appoint two citizens of experience, who in the character of appraisers, with two others whom the purchaser shall designate, and two assistant witnesses, should proceed to the appraisement, survey, and mark the limits of the 40,000 arpents of land, and make a return of the proceedings in order to carry out the object contemplated. I further ordered to be furnished a certified copy of the order under which the Auditor of War was consulted on the proceedings had in the case of the aforesaid Urquhart, with regard to a similar application, and of the opinion which he (the Auditor of War) expressed ; and, this having been done, I approved the same, directing an order to be sent to the said governor and sub-delegate of the royal treasury, as recommended by the Sen'r Fiscal, and for the purposes which he determined, which

was accordingly done; and, in virtue of said order, the operations of survey were performed, and forthwith were measured, surveyed, the limits defined, and marked with stakes, of the 40,000 superficial arpents of land solicited by Don José Reynes; all of which land is in one body or tract, situated in the district of Baton Rouge, and in the spot which will be named hereafter, with a description of the boundaries, by the compass, and situation. This tract of land was valued at $6,000, or at the rate of 15 cents per superficial arpent; which appraisement I ordered to be submitted to the Sen'r Fiscal, who approved it, and decided that, on payment being made by Don José Reynes in the royal coffers of said sum of $6,000, the same being the value of the land, say 40,000 superficial arpents, according to the figurative plan, also the payment of the duty of *media anata* (half-yearly tribute), and 18 per cent. for the transportation of this tribute to the kingdom of Castilla, a title of property should be given to him. That, agreeably and in conformity with this order of the Sen'r Fiscal, I ordered that the Surveyor-General, Don Carlos Trudeau, should examine the operations, or proceedings of survey, made by Don Vincente Pintado; and, if he found them correct, that he should record in his books the plan representing the 40,000 arpents of land solicited by the aforesaid Reynes, and furnish a copy of said plan to accompany the title. That, these formalities having been complied with, I approved, by an act bearing date of 19th of December last, the valuation made of said 40,000 superficial arpents, and ordered that the documents should be sent to the minister of the royal treasury for a liquidation of the value of the land; and, on its being shown that the amount due to the royal treasury had been entirely paid in the royal coffers, in certificates of credit, as proposed by said Don José Reynes, also with the sum for the (*media anata*) half-yearly tribute to the king, and for its transportation to Spain, that then a title of property, in due form, should be given to the party. From the receipt of payment given by the ministry of the royal treasury, bearing date 31st of December last, which receipt is with the proceedings to which I refer, it appears that the said Don José Reynes did pay in the royal coffers 49,416 reales (bits) of silver: 48,000 for the price of the land, at 15 cents per arpent, and the balance, 1,416 reales, for the 2½ per cent. for the half-yearly tribute, and 18 per cent. for the transportation of tribute to Spain; in consequence of which, and it being evident, from the plan and proceedings of survey furnished by the Surveyor-General, Don Carlos Trudeau, bearing No. 1,672, that the said 40,000 superficial arpents are situated in the district of Baton

Rouge, at four miles and one third south of the boundary-line between the domains of his Catholic Majesty and the United States of America, bounded on the north by lands belonging to Jayme Jorda, a captain of the army, and those of an officer of the same grade, Don Manuel de Sanzos; and on the other sides by vacant lands, the River Comite passing through the centre of the said 40,000 arpents, which are also intersected by a branch of said river commonly called the Canaveral.

" Therefore, and agreeably to the power delegated to me, I do hereby grant, under title of sale, to the above-named Don José Reynes, the 40,000 superficial arpents of land which he petitioned for, in the spot, and within the district of Baton Rouge, where they have at his instance been measured, bounded, and surveyed, under the aforesaid limits, as represented by the plan and measurement above cited; all of which, for the better understanding of what is here set forth, as well as the directions, distances, and localities, shall be annexed to this title; and I impart to him (Don José Reynes) entire and clear dominion over said 40,000 arpents of land, that, as his own lands, from having purchased and paid for them to the royal treasury, he may possess, cultivate, and dispose of them at his pleasure; and I do authorize him to take possession of them; in which possession I do hereby place him, without prejudice to any third person who might have a better right.

" In testimony whereof, I have ordered these presents to be delivered under my signature, sealed with my coat of arms, and countersigned by the undersigned, notary of the royal treasury, who, as well as the principal comptroller, will register this act.

" Given in New Orleans, on the 2d day of January, 1804.
(Signed,)            JUAN VENTURA MORALES.
" By order of the Sen'r Intendant.

CARLOS XIMENES.

" The above title has been registered in folio 37 to 40 of the book under my charge destined to that effect, and for titles of said class.
(Signed,)             CARLOS XIMENES.

" Registered in the office of the principal comptroller for the army, and also in the office of the royal treasury, (both of which are under our charge,) at page 38 of the book destined to that effect and purpose.
(Signed,)            GILBERTO LEONARD.
MANUEL ARMIRES."

On the 26th of May, 1824, Congress passed an act (4 Stat. at Large, 52), from which the following are extracts.

The first section declares, — "That it shall and may be lawful for any person or persons, or their legal representatives, claiming lands, tenements, or hereditaments in that part of the late Province of Louisiana which is now included within the State of Missouri, by virtue of any French or Spanish grant, concession, warrant, or order of survey, legally made, granted, or issued, before the 10th day of March, 1804, by the proper authorities, to any person or persons resident in the Province at the date thereof, or on or before the 10th day of March, 1804, and which was protected or secured by the treaty between the United States of America and the French Republic, of the 30th day of April, 1803, and which might have been perfected into a complete title under and in conformity to the laws, usages, and customs of the government under which the same originated, had not the sovereignty of the country been transferred to the United States," to present a petition to the District Court of Missouri, setting forth their claim, and praying that the validity of such title of claim might be inquired into and decided by the said court. The United States were to put in their answer by the District Attorney, and the proceedings in the cause were to be conducted according to the rules of a court of equity.

By the second section it is enacted : — "And the said court shall have full power and authority to hear and determine all questions arising in said cause relative to the title of the claimants ; the extent, locality, and boundaries of the said claim, or other matters connected therewith fit and proper to be heard and determined ; and by a final decree to settle and determine the question of the validity of the title, according to the law of nations ; the stipulations of any treaty, and proceedings under the same ; the several acts of Congress in relation thereto ; and the laws and ordinances of the government from which it is alleged to have been derived ; and all other questions properly arising between the claimants and the United States."

The act of 17th June, 1844 (5 Stat. at Large, 676), entitled "An act to provide for the adjustment of land claims within the States of Missouri, Arkansas, and Louisiana, and in those parts of the States of Mississippi and Alabama south of the thirty-first degree of north latitude, and between the Mississippi and Perdido Rivers," revived and reënacted so much of the act of 26th May, 1824, entitled "An act to enable claimants to land within the State of Missouri and Territory of Arkansas to institute proceedings to try the validity of their claims," so far as the same related to the State of Missouri, and extended the same to the States of Louisiana and Arkansas, and to so much

of the States of Mississippi and Alabama as is above described, "in the same way, and with the same rights, powers, and jurisdictions, to every extent they can be rendered applicable, as if these States had been enumerated in the original act hereby revived, and the enactments expressly applied to them as to the State of Missouri; and the District Court, and the judges thereof, in each of these States, shall have and exercise the like jurisdiction over the land claims in their respective States and districts, originating with either the Spanish, French, or British authorities, as by said act was given to the court and the judge thereof in the State of Missouri."

The treaty of cession by Spain to France is dated 1st October, 1800, and its terms will be found stated in the treaty of cession by France to the United States, dated 30th April, 1803 (8 Stat. at Large, 200). The act of delivery by Spain to France took place on the 30th of November, 1803, and by France to the United States on the 20th of December, 1803. State Papers, Foreign Relations, Vol. II., page 582 et seq.

On the 13th of March, 1846, Reynes filed the following petition : —

"To the Honorable the District Court of the United States in and for the District of Louisiana.

"The petition of Joseph Reynes, who resides in the city of New-Orleans, respectfully represents:

"That by inheritance, being the sole heir of his father, Joseph Reynes, now deceased, he is the owner of forty thousand arpents of land, situated in what was formerly called, under the government of the king of Spain, the district of Baton Rouge, four miles and one third south of the boundary-line between the then territory of the king of Spain and the territory of the United States of America, being bounded on the north by lands the property of James Jorda, and by property of Manuel de Sanzos, and on the other sides by vacant lands; as will more fully appear by an authentic copy of the original act of sale and grant, by Juan Ventura Morales, commissary of the army, intendant and superintendent ad interim for the Province of West Florida, minister charged with the final settlement of all affairs relating to the royal treasury of the king of Spain in Louisiana, to the said Joseph Reynes, deceased, and to the documents, plans, and surveys appended to the same; all of which are authentic, and are referred to and made a part of this petition.

"Petitioner further alleges, that said land is believed to be situated in the parishes of East Feliciana and St. Helena, according to the present territorial divisions of this State.

" Petitioner alleges, that his said father acquired the said land by purchase and grant from said Juan Ventura Morales, the duly authorized officer and agent of the government of Spain, the sovereignty over the territory in which the said land is situated at the time of the aforesaid purchase and grant. That said Morales had full authority from the government of Spain to sell the said land, and to grant a good and perfect title thereto.

" All of which more fully appears from the annexed documents, and also from the original grant from Morales, which has been mutilated by robbers, who entered and robbed the dwelling-house of the petitioner. The said original act in the form in which it now exists is hereunto annexed, together with the plan of the original survey.

" Petitioner alleges, that the survey was made and returned by the duly authorized officers of the government of Spain, on the 19th day of November, A. D. 1803, and that on the 31st day of December, A. D. 1803, the money was paid by his said father to the government of Spain for the land ; and that the above-mentioned grant was made to his father on the 2d day of January, A. D. 1804.

" That at the date of the said sale and grant to his father, he was a resident of the Province of Louisiana. That the said grant was protected by the treaty between the United States and the French Republic of the 30th day of April, 1803. And that said grant might have been perfected into a complete title under and in conformity to the laws, usages, and customs of the government of Spain, had not the sovereignty of the country been transferred to the United States.

" Petitioner further alleges, that the said grant did convey to his said father a full and complete title to the said land, under the laws, customs, and usages of the government of Spain.

" Petitioner alleges, that his claim to the above-mentioned land was presented to the commissioner of the United States for confirmation, and the same was refused, as will be more fully seen by reference to the report of James O. Cosby, the said commissioner, to be found in the 18th volume of the American State Papers, at pages 59 and 66.

" That the United States government has refused, and still refuses, to recognize and confirm the said claim, and has asserted a claim to the same. And that various persons have pretended to set up claims to said land adverse to the rights of the petitioner, to wit, the following persons : L. Saunders, M. Harris, H. Hardesty, Ira Bowman, John Morgan, Josiah Benton, Z. S. Lyons, and Henry Hawford.

The United States *v.* Reynes.

"Wherefore petitioner prays, that the District Attorney of the United States, in behalf of the United States, and the said L. Saunders, M. Harris, H. Hardesty, Ira Bowman, John Morgan, Josiah Benton, Z. S. Lyons, and Henry Hawford, be cited to answer this petition, and that, after all due proceedings had. the validity of petitioner's claim be inquired into, and that he be decreed to be the true and lawful owner of the said forty thousand arpents of land. And that for so much of said land as shall be ascertained to have been sold by the United States, the petitioner shall be allowed a like quantity of the public lands belonging to the government of the United States, as provided for by law, and for all other relief in the premises, &c., &c.

(Signed,)          ELMORE & KING,
*Solicitors for Complainant.*

"Joseph Reynes, being duly sworn, deposeth that the allegations of the above petition are true.

(Signed,)          REYNES.

"Sworn to and subscribed before me, this 13th of March, 1846.

(Signed,)        L. E. SIMONDS, *Deputy Clerk.*"

Annexed to this petition were the above-recited certificates of survey and grant.

In June, 1846, sundry witnesses were examined on behalf of the petitioner, for the purpose of verifying the signatures, &c.

The District Attorney appeared on behalf of the United States, and traversed the petition. The other defendants allowed judgment to go against them by default.

On the 3d of November, 1846, the court pronounced the following decree : —

"The court having heretofore taken this case under consideration, and having maturely considered the same, doth now order, adjudge, and decree, that the petitioner recover the land claimed in his petition, and described in the survey of Pintado, revised by Trudeau, appended thereto ; and if it should happen that any portion of said land has been sold or otherwise disposed of by the United States, it is ordered that for such portions the petitioner have the right to enter other lands belonging to the United States, at any land office in Louisiana, according to the provisions of the eleventh section of the act of 1824. And it appearing by reference to the order of this court, dated the 17th day of June, 1846, that petitioner's petition has

been heretofore taken *pro confesso*, against L. Saunders, M. Harris, H. Hardesty, Ira Bowman, John Morgan, Josiah Benton, Z. S. Lyons, and Henry Hawford, and the said defendants not having entered their names to the said petition, or taken any steps to set aside the said order taking the petition *pro confesso*, it is further ordered and decreed that the petitioner recover the above-described land from the said defendants, unless the portions they may claim shall have been sold to them by the government of the United States, or otherwise disposed of by the said government to the said defendants; in which event the petitioner is to obtain relief in the manner above pointed out, where the government of the United States have sold or otherwise disposed of any portion of the land he claims.

"Judgment rendered November 3d, 1846; judgment signed November 12th, 1846.

(Signed,)　　　Theo. H. McCaleb, *U. S. Judge.*"

From this decree the United States appealed to this court.

The cause was argued for the appellants by *Mr. Johnson* (Attorney-General), and by *Messrs. Brent* and *May*, for the appellee.

*Mr. Johnson* made the following points.

I. That the land in controversy, being within the limits of the territory ceded to the United States by France by the treaty of 30th of April, 1803, Spain had no authority to dispose of it, her title having passed to France by the treaty of St. Ildefonso of the 1st October, 1800, and, consequently, the grant in this case is void. Foster and Elam *v.* Neilson, 2 Pet. 253 ; Lee *v.* Garcia, 12 Pet. 511 ; and the 18th volume of State Papers.

II. That the act of Congress of the 26th March, 1804, section 14, having declared null, void, and of no effect, all grants made within said territory after the 1st of October, 1800, the act of 1844, extending the act of 1824 to said territory, is to be construed, among other things, with reference to said act, and is not to be considered as giving validity to any grants made after that date.

*Mr. Johnson* then gave a history of the country between the Mississippi and Perdido Rivers. The executive and legislative departments of the government always asserted that it passed to the United States under the Louisiana treaty, because Spain ceded Louisiana to France with the same limits which bounded the Province when France formerly possessed it, which limits

included the country in question. He referred to the corre-
spondence between our ministers and M. Cevallos, the Minister
of Foreign Relations of Spain, in "State Papers," Foreign Re-
lations, Vol. II. pp. 629 to 660. Spain said this country did
not belong to us, and retained possession of it until the year
1810. The rest of Louisiana was delivered to us in 1804.
All grants, in order to be valid, must have emanated, after
1803, from the United States; and between 1801 and 1803
from the French government. This court has given this con-
struction to the treaty. In the case of Foster and Elam *v.*
Neilson, the court had only the American copy of the treaty of
1819 before it, which said that grants of land should be ratified
and confirmed, implying that some act of ratification was to be
done by our government after the treaty. But in the Arredon-
do case, the Spanish copy was produced, which said that the
grants should remain ratified and confirmed. But this article
only related to the Spanish side of the line, and had no appli-
cation to what had been our side of the line since 1803. In
Garcia *v.* Lee, the court confirmed its former decision, except
so far as it was changed by the production of the Spanish copy
of the treaty of 1819. We became proprietors of Louisiana in
October, 1800. Consequently, all subsequent Spanish grants
are void, like the grant now before us. The court below con-
firmed this grant, upon the ground that the act of Congress of
1824 imparted validity to it. This is the only question now
to be argued; all the rest is settled law.

(*Mr. Johnson* then referred to and examined all the laws of
Congress between 1804 and 1824, to show that they all con-
sidered such grants void.) The act of 1824 does not recognize
such a grant as valid. The claimant must show that the grant
under which he claims was *legally* made, which it was not;
and he must show, also, that the inchoate would have ripened
into a perfect title under the Spanish laws, which the present
grant could not have done. He must show that the grant was
protected by our treaty with France. But the date of the
grant here is subsequent to the treaty, and to confirm it we
should have to recognize Spain as the sovereign of the country.
The only grants embraced within the act of 1824 are those
made by Spain before 1800, or by France between 1800 and
1803. The act of 1844 did not go as far as that of 1824, be-
cause it only revived so much of it as was applicable. The
state of the question was well known then, and Congress could
not have intended to undo what they had been doing ever
since 1804, when they declared all such grants void.

12 *

*Messrs. Brent* and *May*, for the appellee, contended, —

1. That his title papers (not objected to in the court below) establish a sufficient title, under the laws of Spain, to entitle him to the benefits of the act of 26th May, 1824.

2. That the grant relied on was in itself a complete title prior to the 10th of March, 1804 ; and if not, then the claim set up might have been matured into a complete title, had not the country been transferred to the United States.

3. That the decree should be affirmed.

The act of 17th June, 1844, ch. 95 (5 Stat. at Large, 676), revives so much of the act of 26th May, 1824, ch. 173 (4 Stat. at Large, 52), as relates to the State of Missouri, for five years, and applies the law of 1824 to Louisiana, the same as it was enacted for Missouri.

By the act of 1844, ch. 95, therefore, the court has jurisdiction over land claims, originating with the Spanish, French, or British authorities, to the same extent that the court had under the Missouri law.

The act of 1824, ch. 173 (4 Stat. at Large, 52,) allows any person claiming lands in that part of the late Province of Louisiana which is now included within the State of Missouri, by virtue of any French or Spanish grant, concession, warrant, or order of survey, legally made, granted, or issued, before the 10th of March, 1804, by the proper authorities, to any person, &c.; resident in the Province of Louisiana at the date thereof (meaning the date of the grant, &c.), or on or before the 10th of March, 1804, (meaning resident in Louisiana on or before the 10th of March, 1804,) which was protected or secured by the treaty between the United States of America and the French Republic, of the 30th April, 1803, and which might have been perfected into a complete title, under and in conformity to the laws, usages, and customs of the government under which the same originated, had not the sovereignty of the country been transferred to the United States. The act then proceeds to direct the manner of instituting suit, &c.

The facts connected with this very claim will be found fully reported by the Commissioner in the 18th volume of American State Papers, (3d vol. on Public Lands,) 59 and 66.

With a view to explain the rights secured by this act of 26th May, 1824, we will briefly examine the cases arising in this court in regard to Spanish claims ; and more particularly, those decided under this very law.

Foster and Elam *v.* Neilson, 2 Peters, 254, was a petitory or possessory action brought by individuals against a possessor (under no special act of Congress), to recover lands lying east

of the Mississippi River and west of the Perdido. It was brought to try the question whether that district of country passed to the United States under the treaty of Paris, dated 30th April, 1803, and if it did not so pass, then to raise the inquiry whether the Spanish grants made by Spain while she was *de facto* sovereign of all that district of country were not protected by the eighth article of the treaty of Washington, 22d February, 1819, by which Spain ceded to the United States the two Floridas.

On both these questions the court decided against the claimants. On the first, because the legislative and executive departments had precluded all inquiry into this purely politi.al question, by asserting our right to the territory under the tr .ty of 1803. (See 2 Peters, 307.) And on the second question, because the court, although divided on the effect of the eighth article of that treaty, (see 2 Peters, 313,) fully concurred in considering that treaty as practically securing no rights to Spanish claimants, until Congress should legislate for the purpose of executing its guarantees. (2 Peters, 314, 315.) And inasmuch as Congress had failed to confirm Spanish titles west of the Perdido, therefore no right could be set up at law under that treaty. (2 Peters, 315.) And the difficulty which in that case was insurmountable was, that, even if the treaty of 1819 protected the Spanish titles west of the Perdido, yet Congress had never repealed the fourteenth section of the act of 1804 (2 Stat. at Large, 287). See 2 Peters, 317.

Now, as our land lies within the disputed territory, it is clear that we cannot recover unless Congress has, by the act of 1824, above recited, conferred new rights on the Spanish claimants. We shall contend that the act of 1824 is not meant to open the question whether the lands or territory in dispute passed to our government by the treaty of 1803, but, assuming that they did so rightfully pass, still to recognize those grants as entitled to respect, because made by the government *de facto*. And surely nothing could be more inequitable than for our government to repudiate grants made by Spain while in actual possession of the territory, with a claim to hold it rightfully.

Hence the act of 1824, § 2, enacts that the final decree shall "settle and determine the question of the validity of the title according to the law of nations, the stipulations of any treaty and proceedings under the same, the several acts of Congress in relation thereto, and the laws and ordinances of the government from which it is alleged to have been derived, and all other questions properly arising between the claimants and United States"

According to the law of nations, and regarding it alone as the basis of the decree, the grants of a government *de facto* are valid. In support of this position, we refer to State of Rhode Island *v.* Massachusetts, 12 Peters, 748; 12 Wheat. 535; 8 Wheat. 509; 6 Peters, 712, 734; 10 Peters, 330; Ibid. 718; 8 Peters, 445; 9 Peters, 139; 5 Rob. Adm. Rep. 113; 1 Kent's Com. 177.

It will be seen by reference to history, and to the decision of this court, that the formal surrender to the United States was not made until the 20th of December, 1803, and that in fact the United States did not take possession until some time after. Foster and Elam *v.* Neilson, 2 Peters, 303.

That Spain was in possession of this territory in 1804 and later, and issued grants thereof, was recognized in Keene *v.* McDonough, 8 Peters, 310; Pollard's Heirs *v.* Kibbe, 14 Peters, 364. So that here was a *de facto* sovereignty certainly until the 20th of December, 1803.

On the 19th of November, 1803, the Spanish surveyor had returned the certificate of his location of the lands of Reynes, giving the boundaries and returning the appraisement or price to be paid, and certifying the delivery to the purchaser.

This alone was an inchoate title prior to a surrender of possession by Spain, which would *per se* entitle us to recover, as it recites an order of survey and is based on such order, because the order alone would be sufficient if it could be matured to a complete title under the Spanish laws as to the extent to which inchoate rights are protected. See Mitchell *v.* U. States, 9 Pet. 711; Chouteau's Heirs *v.* U. States, 9 Pet. 145; Barry *v.* Gamble, 3 How. 32.

But it will be observed that the act of 26th May, 1824, equally respects titles which have been completed under the Spanish authorities, prior to the 10th of March, 1804.

Congress have therefore virtually submitted the question to the courts, whether a grant like the one to Reynes (which was executed by Morales, 2d January, 1804) should, on the principles of equity or the law of nations, or the terms of "any treaty or any act" of Congress, be confirmed and respected.

It does not distinctly appear why Congress fixed the 10th of March, 1804, as the limit of inquiry, unless that was the period when possession of Louisiana by the United States was supposed to be consummated. This court have fixed the date of our possession of Louisiana to be in March, 1804. Chouteau *v.* Eckhart, 2 How. 373.

The fourteenth section of the act of 26th March, 1804 (2 Stat. at Large, 287), had annulled all Spanish grants subsequent to

the treaty of St. Ildefonso in 1800, and doubtless Congress meant, by designating the 10th of March, 1804, as the limit of inquiry, to admit the equity of all legal grants made by the authorities in possession, and even all inchoate rights originating prior to that day.

It cannot be possible that Congress designed by the act of 26th May, 1824, to submit grants, &c., made by Spain prior to the 10th of March, 1804, to the jurisdiction of the courts, merely to decide that Spain had no title to make such grants. We therefore regard the act of Congress as virtually admitting the title of Spain to make these grants up to the 10th of March, 1804. But even if the courts are to decide on the title of Spain, as well as the validity of the grant under her laws, then it is clear that the title of a *de facto* sovereign is sufficient.

Should it be contended that the words, " which was protected or secured by the treaty between the United States of America and the French Republic of the 30th April, 1803, and which might have been perfected into a complete title," &c., are restrictive of the class of claims to be adjudicated on, and designate only such claims as had originated at the date of that treaty, and exclude such claims as originated after that date and prior to the 10th of March, 1804, then we submit that such a construction would reject as idle and unmeaning all that part of the act which refers to orders of survey, grants, &c., made or issued prior to the 10th of March, 1804; for if grants or titles acquired subsequent to the treaty of 30th April, 1803, are not protected by its terms, then why designate the 10th of March, 1804, as the period anterior to which any order of survey, &c., might be considered and decided? Can it be that an order of survey made prior to the 10th of March, 1804, is to be considered merely to be rejected? Such a construction, without reason and in violation of the letter of the law, must be wholly untenable.

The treaty of Paris, by which the United States acquired Louisiana from France, will be found in 2 White's New Recopilacion, 196, and bears date on the 30th of April, 1803, by which it will be seen that France only ceded Louisiana " as fully and in the same manner " as she had acquired it by the treaty of St. Ildefonso. See Art. 1.

Now, whatever rights were acquired by France, it will be seen that the act of delivery by Spain only bears date the 30th of November, 1803, and was not deposited among the archives until the 28th of December, 1803. 2 White's New Recopilacion, 195, 196.

So that it is clear that France had no actual possession until

the 30th of November, 1803, nor did she transfer this possession to the United States until the 20th of December, 1803. 2 White's Recopilacion, 226. And even these transfers were mere paper transfers of possession, which in fact was not consummated until some time afterwards.

Art. 4th of this treaty provides for the sending of a French commissary thereafter, to deliver possession of Louisiana to the United States; and Art. 5th shows that the possession was not designed to be changed, or, in other words, that the treaty was not to go into effect until the exchange of ratifications. This exchange of ratifications did not take place until the 21st of October, 1803, so that rights which were inchoate prior to that day are secured by the treaty under its guarantees of property to the citizens. 12 Pet. 299.

If, therefore, the treaty be regarded as speaking from the exchange of ratifications, then our order of survey was expressly protected, being dated on 1st September, 1803, as recited in the return of survey and appraisement and delivery. These recitals are evidence. U. States v. Arredondc, 6 Pet. 729, 731; U. States v. Clark, 8 Pet. 448. See also this order of survey, 18 American State Papers, 59; 3 Story on Const. § 1507; Rawle on Const. 56, 57; Vattel, §§ 156, 208.

It will be seen that no objections were taken below to the petitioner's evidence, or the facts recited therein. Then there is proof in this cause of an inchoate title expressly protected as property by the treaty, speaking from the date of its ratification, 21st October, 1803; and if so, the cause is ended.

But if we are wrong in this, then we contend that the third article of the treaty, which declares that, "in the mean time, they (the inhabitants) shall be maintained and protected in the free enjoyment of their liberty, property, and religion," was designed, not only to protect existing grants, but such property as might, in the mean time, be lawfully acquired, either by purchase from individuals, or the government *de facto*.

The right to acquire property may be said to be property; and inasmuch as the United States were not in a condition to grant the public domain until the 20th of December, 1803, or after that time, the treaty must be equitably construed as protecting, prospectively, property acquired from Spain, while her laws were lawfully in force. Otherwise, rights arising under those laws would be disregarded, while the laws were held valid, and binding on the inhabitants. In support of these views we refer to the case of Delassus v. The United States, 9 Pet. 131; but more earnestly to the case of Smith v. The United States, 10 Pet. 330.

Our grant being signed by Morales, the Governor and Intendant of Louisiana, as proved by Mazureau, and by Bouligny; there can be no question about his power to make such a grant, as this court has already decided. 2 How. 374; 4 How. 460. Also, 6 Pet. 714 and 723, 724, 727.

The case of Arredondo v. The United States, 6 Pet. 691, was instituted under the sixth section of the act of 23d May, 1828. The sixth section of this law will be found in the note to 6 Peters, 707; by which it appears that the Arredondo claim, which contained more land than the commissioners were authorized to decide on (they being limited to a league square, 6 Pet. 706), depended on this very act of 26th May, 1824, which was, in such cases, applied to Florida. See 6th section, recited in 6 Peters, 707, 708. In that case the court say, that the case, as presented under the act of 1824, assumes a very different aspect (from that of Elam and Foster v. Neilson), — that the ownership of the land, by the United States or the claimant, is to be considered as a "purely judicial question," and to be decided "as between man and man." 6 Pet. 712.

And in that very case the court proceeded to confirm the claim, by regarding the treaty of cession, not as requiring further legislation to confirm the claims, but as of itself, and by itself, the basis of a valid title.

Next in order is the case of The United States v. Perchman, 7 Peters, which is only material as establishing that the decision in Elam and Foster v. Neilson would have been different if the Spanish copy of the treaty of 1819 had been before the court (see 7 Pet. 89); and as being a case in which the Spanish claim was established substantially under the act of 26th May, 1824, which was applicable to the case. See 7 Pet. 84, 85.

Garcia v. Lee, 12 Pet. 515, was a case not instituted under any act of Congress, but, like Foster and Elam v. Neilson, involved the right of Spain to grant titles in that part of Louisiana east of the Mississippi River; and it was held, that the grant, being by Spain in 1806, was to be disregarded, under the principles of Foster and Elam v. Neilson.

Les Bois v. Bramell, 4 How. 463, considers the confirmation of a Spanish claim by a Board of Commissioners, or by Congress directly, or by the District Courts, by force of the act of 1824, as a location of land, by a law of the United States.

Mr. Justice DANIEL delivered the opinion of the court.

The petitioner in the court below, as the heir of Jose Reynes, claimed under a grant from the government of Spain,

forty thousand arpents of land, lying within what was formerly the district of Baton Rouge, now making portions of the parishes of East Feliciana and St. Helena in the State of Louisiana. The documents upon which this claim is asserted, so far as the formalities entering into the creation of a complete title under the Spanish government are requisite, appear to be regular, and to have been admitted in evidence without exception. No exception either has been taken to the verity of the signatures and certificates appended to those documents, or to the truth of the official position of the agents by whom those signatures and certificates have been made. The questions arising upon this record grow out of considerations beyond the mere facts admitted as above mentioned, considerations involving the powers of the agents, whose acts are relied on, as affected by the treaties, by the political sovereignty, and by the legislation of the United States.

The petition in this case, if not by its own terms, has, by the arguments adduced in its support, been rested upon the act of Congress of May 26, 1824, (reënacted by the act of June 17, 1844, and extended in its operation to claims originating with either the Spanish, French, or British authorities,) by which act it seems to be supposed that, beyond the mere permission therein given to proceed against the United States as defendants in their own courts, some essential rights in the subjects of pursuit have been originated or superinduced on behalf of claimants, — rights which but for the law of 1824 could not have existed. The character of this hypothesis requires particular examination, as upon its correctness or its fallacy must depend the fate of this claim, and of every other similarly situated. Pursuing this theory, it is insisted that the petitioner (the defendant in error here), as the heir of a purchaser for valuable consideration from the Spanish authorities, and holding the evidences of a perfect title from those authorities, is now permitted to show that he falls within the class of persons whose rights have been protected, both by the treaty of St. Ildefonso, between Spain and France, of the 1st of October, 1800, and by the treaty of Paris between France and the United States, of the 30th of April, 1803, and who are specially referred to and provided for in the act of 1824. In answer to this pretension of right under the act of 1824, it might perhaps be sufficient to observe, that, if this right be asserted in virtue of a perfect Spanish title, it would seem to be comprised neither within the mischief nor the remedy contemplated by the statute. The mischief intended to be provided for by the act of 1824 was the inchoate or incomplete condition of titles having a fair

and just and legal inception under either the French or Spanish governments of Louisiana, but which, by reason of the abdication or superseding of those governments, and by that cause only, had not been completed. The remedy was the permission to bring such titles before the courts of the United States, and there to render them complete, and to establish them by proof of the legality and justice of their origin and character. Such, then, being the mischief declared, and such the remedy provided by the statute, it is difficult to perceive the reason or the authority for bringing before the courts merely for supervision titles alleged to be already perfected under the unquestionable and competent authority of either Spain or France. With regard to titles so derived and so consummated, there is no provision made by the statute. None could be requisite; and there could, with reference to such titles, be nothing for the courts to act upon, nothing which it was competent for them to consider. Conceding for the present that the title before us has not been completed, the inquiry presents itself, whether in other respects it corresponds with the description of claims authorized by the law to be brought before the courts for completion and establishment. Amongst the requisites demanded for these titles by the statute are the following. That they shall be legally granted, by the proper authorities, to persons resident within the Province of Louisiana at the time, or on or before the 10th day of March, 1804; that they should be such claims as were protected or secured by the treaty between the United States and the French Republic of the 30th of April, 1803, and which might have been perfected into complete titles under and in conformity to the laws, usages, and customs of the government under which the same originated, had not the sovereignty of the country been transferred to the United States. With regard to the modes of proceeding by which these claims are to be brought before the courts, the statute next prescribes that it shall be by petition setting forth fully and plainly the nature of the claim to the lands, &c., particularly stating the date of the grant, concession, warrant, or order of survey, under which the claim is made, by whom issued, &c.

By the second section of the statute it is enacted, that every petition which shall be prosecuted under its provisions " shall be conducted according to the rules of a court of equity, except that the answer of the District Attorney of the United States shall not be required to be verified by his oath, — and the said court shall have full power and authority to hear and determine all questions arising in said cause, relative to the title of the claimant, the extent, locality, and boundaries of the

claim, or other matters connected therewith, fit and proper to be heard and determined, and by a final decree to settle and determine the question of the validity of the title, according to the laws of nations, the stipulations of any treaty, and pro-ceedings under the same, the several acts of Congress in relation thereto, and the laws and ordinances of the governments from which it is alleged to have been derived."

In part compliance with the act of Congress, the petitioner alleges, that his father acquired the land claimed (now situated within the parishes of East Feliciana and St. Helena in the State of Louisiana) by purchase and grant from Juan Ventura Morales, the duly authorized officer and agent of the Spanish government, the then sovereignty over the territory in which the said land is situated, at the time of the purchase and grant; and that Morales had full authority from the government of Spain to sell the said land, and to grant a good and perfect title thereto. The petitioner goes on to allege, a survey made and returned by the duly authorized officer of the Spanish government, on the 19th day of November, 1803; payment of the purchase-money, on the 30th of December, 1803, and the emanation or issuing of the grant to the father of the petitioner, on the 2d of January, 1804. In support of the petition there are made exhibits, the certificates of the deputy and principal surveyors, Pintado and Trudeau, and the grant from Morales to the father of the petitioner, for the land in question; these documents respectively correspond in dates with the allegations of the petition.

Upon the aforegoing allegations and documents it is insisted for the defendant in error, that by operation of the acts of 1824 and 1844 already cited, and by virtue of stipulations in the treaties of St. Ildefonso and of Paris, and by the rules of the law of nations as applicable to those treaties, his rights to the land granted by Morales to his father have been protected, and that the petitioner is entitled thereto, as adjudged to him by the District Court.

With respect to that interpretation of the acts of Congress which would expound them as conferring on applicants new rights not previously existing, we would remark that such an interpretation accords neither with the language nor the obvious spirit of those laws; for if we look to the language of the act of 1824, we find that the grants, surveys, &c., which are authorized to be brought before the courts, are those only which had been legally made, granted, or issued, and which were also protected by treaty. The legal integrity of these claims (involving necessarily the competency of the authority

which conferred them) was a qualification associated by the law with that of their being protected by treaty. And as to the spirit and intention of the law, had it designed to create new rights, or to enlarge others previously existing, the natural and obvious means of so doing would have been a direct declaration to that effect; certainly not a provision placing these alleged rights in an adversary position to the government, to be vindicated by mere dint of evidence not to be resisted. The provision of the second section of the act of 1824, declaring that petitions presented under that act shall " be conducted according to the rules of a court of equity," should be understood rather as excluding the technicalities of proceedings in courts, than as in any degree varying the rights of parties litigant; as designed to prevent delays in adjudicating upon titles, as is further shown in another part of the same sentence, where it is declared that these petitions shall be tried without continuance, unless for cause shown. The limitations, too, maintained as to the character of claims and that imposed upon the courts in adjudicating upon them, is further evinced in that part of the same section which says, that the court shall hear and determine all questions relative to the title of the claimants, the extent, locality, and boundaries of the claim, and by final decree shall settle and determine the questions of the validity of the title, according to the law of nations, the stipulations of any treaty, and proceedings under the same, the several acts of Congress, and the laws and ordinances of the government from which it is alleged to have been derived. In some aspects of these claims, they were properly to be denominated equitable. They were to be equitable in the sense that they should not be inequitable or wrongful, — that they should be rightful, and founded in justice; and they were necessarily to be equitable in so far as they were incomplete, and could not therefore be maintained as perfect legal titles. But in no proper acceptation could they be called equitable titles, as implying any addition to their strength or any diminution of the rights of the United States, as affected by the statute.

We come now to the inquiry, whether the grant in question was protected either by the treaty of retrocession from Spain to the French Republic, or by the treaty of Paris, by which the Territory of Louisiana was ceded to the United States. The treaties above mentioned, the public acts and proclamations of the Spanish and French governments, and those of their publicly recognized agents, in carrying into effect those treaties, though not made exhibits in this cause, are historical and notorious facts, of which the court can take regular judicial

notice; and reference to which is implied in the investigation before us.

It is proper in this place again to refer to the date of the certificate of survey on which the grant in question was issued, and to that of the grant itself. The former purports to have been given on the 19th day of November, 1803, the latter to have been issued by Morales on the 2d of January, 1804. The dates of the treaties of St. Ildefonso and of Paris have already been mentioned, — that of the former being the 1st of October, 1800, that of the latter the 30th of April, 1803. In the construction of treaties, the same rules which govern other compacts properly apply. They must be considered as binding from the period of their execution; their operation must be understood to take effect from that period, unless it shall, by some condition or stipulation in the compact itself, be postponed. Were it allowable at this day to construe the treaty of St. Ildefonso as not being operative from the signature thereof, its operation could by no construction be postponed to a period later than the 21st of March, 1801, at which time, by the treaty negotiated by Lucien Bonaparte and the Prince of Peace, Spain accepted from the French Republic the Grand Duchy of Tuscany in full satisfaction of the provision stipulated in favor of the Duke of Parma: or at the farthest, the government of Spain must be concluded, as to satisfaction of the stipulation above mentioned, by the royal order issued at Barcelona on the 15th of October, 1802, announcing from the king to his subjects the retrocession of Louisiana, and giving orders for the evacuation of the country by all Spanish authorities, and its delivery to General Victor, or any other officer authorized. by the French Republic to take possession. In obedience to this order, formal possession was on the 30th of November, 1803, delivered by Salcedo and Casa Calvo, the Spanish Commissioners, to Laussatt, the Prefect and Commissioner of the French Republic. The treaty between the United States and the Republic of France contains no article or condition by which its operation could be suspended. It declares that the Republic, in pursuance particularly of the third article of the treaty of St. Ildefonso, has an incontestable title to the domain and to the possession of the territory, and cedes it to the United States in the name of the French Republic for ever, and in full sovereignty, with all its rights and appurtenances. This treaty therefore operated from its date; its subsequent ratification by the American government, and the formal transfer of the country to the American Commissioners on the 20th of December, 1803, have relation to the date of the instrument. The rights

The United States *v.* Reynes.

and powers of sovereignty, on the part of Spain, over the territory, ceased with her transfer of that sovereignty to another government; it could not exist in different governments or nations at the same time.    The power to preserve the peace and order of the community may be admitted to have been in the officers previously appointed by Spain, until the actual presence of the agents of the succeeding government; but this would not imply sovereign power still remaining in Spain, — for if she continued to be sovereign after expressly conceding her sovereignty to another government, she might still rightfully resist and control that government; for sovereignty from its nature is never subordinate.    She might, if still sovereign, notwithstandng her treaty stipulations with France, have ceded the entire territory to some other nation.    That the government of Spain never supposed that any sovereign authority was retained by it after the cession to France, is apparent from the character of the treaty itself, and of the acts of the Spanish government carrying that treaty into effect. ˙ It is a somewhat curious fact, that there is not in this treaty a single stipulation or guarantee in favor of the lives or the property of the subjects or inhabitants of the ceded country, much less a reservation of power to grant or invest new rights within that territory.    The same characteristic is observable in the royal order announcing the cession, and also in the formal act of delivery of the territory.    So far from containing any such stipulation or reservation, the language of his Catholic Majesty may correctly be understood as conveying an acknowledgment that he had made no condition or stipulation whatever in behalf of his late subjects; and had no power to insist on any thing of the kind; but had handed them over to the justice or the liberality of the new government to whom he had transferred them.    Thus, in the order of Barcelona, after announcing the cession of the territory, and directing the collection of all the papers and documents relating to the royal treasury, and to the administration of the colony of Louisiana, in order to bring them to Spain for the purpose of settling the accounts; and an inventory of all artillery, arms, ammunition, effects, &c., which belong to him; and an appraisement of them in order that their value might be reimbursed him by the French Republic, he uses this language ; — " Meanwhile, we hope, for the tranquillity of the inhabitants of said colony, and we promise ourselves, from the sincere amity and close alliance which unite us to the government of the Republic, that the said government will issue orders to the governor and other officers employed in its service, that the ecclesiastics and religious houses employed in the service of the

13 *

parishes and missions may continue in the exercise of their functions, and in the enjoyment of their privileges and exemptions, granted to them by the charters of their establishments. That the ordinary judges may, together with the established tribunals, continue to administer justice according to the laws and customs in force in the colony. That the inhabitants may be protected in the peaceful possession of their property. That all grants of property, of whatever denomination, made by my governors, may be confirmed, although not confirmed by myself. I hope further that the government of the Republic will give to its new subjects the same proofs of protection and affection which they have experienced under my dominion."

This order from the king is an explicit admission of what the treaty itself exposes; namely, that no special stipulation had been made for the protection either of persons or property ; that he regarded his own authority and the dominion of Spain over the territory as at an end, and that his sole reliance for the protection and welfare of his late subjects, and even for enforcing the grants he himself, through his officials, had made to them, was on the justice and benevolence of the new government. So far as the acts of the king of Spain are to be considered in connection with the territory and its inhabitants ceded by him, he appears to have committed both to those practices and to that discretion which obtain in civilized communities, wholly uninfluenced by any pledge or condition exacted by himself.

The proclamation of the Spanish provincial officers is almost a literal repetition of this royal order. The treaty of St. Ildefonso, then, can, by no rule or principle deducible from the laws of nations, be interpreted as still reserving to Spain, after the signature of that treaty, the power to grant away the public domain ; for she could have had no right to calculate upon the *mala fides* of the French Republic with regard to the provision for the Duke of Parma, and to make such calculation an excuse for *mala fides* on her own part. But surely no right, under any pretext, to grant the public domain, could exist in Spain after the treaty of Aranjuez of March 21st, 1801, between that country and France, by which the Grand Duchy of Tuscany, that had been previously ceded to the French Republic, was accepted by Spain in full satisfaction of the provision agreed to be made for the Duke of Parma. And least of all could such a power continue in the government of Spain after the royal order of the 15th of October, 1802, proclaiming the retrocession of the Territory of Louisiana and the fulfilment or satisfaction, of course, of all treaty stipulations in reference

to that territory; and all this, too, promulgated under the signature of the king himself.

It may now be properly asked, What, then, are the grants, titles, or other rights protected by the third article of the treaty between the United States and the French Republic, of the 30th April, 1803, and by the acts of Congress of 1824 and 1844, referring to that treaty, and to previous acts of the Spanish government? The third article of the treaty of Paris of 1803 is in these words: — " The inhabitants of the ceded territory shall be incorporated in the union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States; and in the mean time they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion which they profess." The term *property* in this article will embrace rights either in possession, or in action ; property to which the title was completed, or that to which the title was not yet completed ; but in either acceptation, it could be applied only to rights founded in justice and good faith, and based upon authority competent to their creation. The article above cited cannot, without the grossest perversion, be made either to express or imply more than this. According to this just and obvious rule of interpretation, the treaty of Paris, of April 30th, 1803, by any reference it could be supposed to have to titles or claims derived from Spain, could embrace such only as had their origin whilst Spain was the rightful sovereign over the territory ; a period which, by the most liberal extension of her power, cannot be carried farther than the 15th of October, 1802, the date of the royal order of Barcelona. Indeed, if not from the date of the treaty of St. Ildefonso, yet certainly from the 21st of March, 1801, grants by Spain of the public domain in Louisiana would have been frauds upon the French Republic, since by the treaty of Aranjuez, of the date last mentioned, full satisfaction of the terms stipulated for the Duke of Parma was acknowledged by Spain. Looking more particularly to the documents on which this claim is founded, we find it recited in the certificate of Pintado, that the land in question had been surveyed by him in obedience to a decree of the General Intendancy of the Province, under date of the 1st of September, 1803. This decree is not produced in evidence, but, upon the supposition that it was in the record and properly verified, the question of the competency of the authority to order it would stand precisely as it does in its absence. Turning next to the grant itself, there are, in addition to the fact of

the date of that instrument, other circumstances disclosed upon its face, showing not only the want of authority in the grantor to make a good title, but which bring home to the grantor and to the individual soliciting the grant full knowledge that the title to whatever might be properly considered Louisiana, at least, no longer remained in the Spanish government. The grant is dated at New Orleans. It recites the application of Reynes for 40,000 arpents of land, to be paid for in letters of credit formerly issued by the provincial government, and then goes on to state, that, in consequence of the petition, Morales had caused a certified copy of the letter addressed by that Intendancy to the Commissioners appointed for the transfer of the Province of Louisiana, to be submitted, with the petition, to the Solicitor of the Crown. This document, then, excludes all doubt as to the knowledge of the parties of the cession to the United States of Louisiana by whatever might have been its real boundaries. It is signed by Morales, not as being an officer of the Territory of Louisiana, but as Intendant of the Province of West Florida, after Louisiana had passed to two sovereign states since its possession by Spain, and after actual possession had been delivered to the United States. It is clear, then, that the documents exhibited and relied on by the appellee could by their own terms convey no title within the Territory of Louisiana. Superinduced upon our conclusions drawn from the treaties above mentioned, and from the laws of nations applicable to their construction, is the positive legislative declaration in the act of Congress of March 26, 1804, " pronouncing all grants for lands within the territories ceded by the French Republic to the United States by the treaty of the 30th of April, 1803, the title whereof was at the date of the treaty of St. Ildefonso in the crown, government, or nation of Spain, and every act and proceeding subsequent thereto, of whatsoever nature, towards the obtaining of any grant, title, or claim to such lands, under whatsoever authority transacted or pretended, be, and the same are hereby declared to be, and to have been from the beginning, null, void, and of no effect in law or equity." This act of 1804 explicitly avows the opinion of the government of the United States as to any power or right in Spain at any time after the treaty of St Ildefonso. It covers the whole subject of grants, concessions, titles, &c., derived from Spain at any time subsequent to the treaty, stamping upon all such grants, &c., the most utter reprobation; denying to them any validity or merit, either legal or equitable. This act of 1804 has never been directly repealed. It still operates upon all the grants, concessions, &c., embraced within its pro-

visions, except so far as these provisions may be shown to have been modified by posterior legislation. And it has been invariably held, and indeed must follow as of necessity, that imperfect titles derived from a foreign government can only be perfected by the legislation of the United States. But it is argued for the appellee, that as the land in dispute did not lie within the territory of which France obtained from Spain actual occupancy, or of which the United States ever obtained a like occupancy until possession thereof was taken under the proclamation of President Madison, of October 10th, 1810, and as the Spanish authorities in the mean time, as a government *de facto*, retained possession, they could in this character invest their grantees with inchoate or equitable rights, which, under the privileges bestowed by the acts of 1824 and 1844, might be matured into perfect titles as against the United States. Without stopping to remark upon the caution which should ever be manifested in the admission of claims which, if not founded in violence or in mere might, yet refer us for their origin certainly not to regular unquestioned legal or political authority, it may be safely said, that claims founded upon the acts of a government *de facto* must be sustained, if at all, by the nature and character of such acts themselves, as proceeding from the exercise of the inherent and rightful powers of an independent government. They can never be supported upon the authority of such a government, if shown to have originated in a violation of its own compacts, and in derogation of rights it had expressly conceded to others. Every claim asserted upon wrong, such as this latter position implies, would be estopped and overthrown by alleging the compact or concession it sought to violate. Thus, if Spain, by the treaty of St. Ildefonso, did in truth cede to France the lands lying between the Mississippi and Perdido, she could not, as a government *de jure* or *de facto*, without the assent of the United States, possessing all the rights of the French Republic, make subsequent grants of the same lands either to communities or to individuals. Her grants could not be regarded as the inherent, competent, and uncommitted proceedings of an independent government *de facto*; they would be met and made null by her own previous acknowledgment.

Whether, by the treaties of St. Ildefonso and of Paris, the territory south of the thirty first degree of north latitude, and lying between the Mississippi and Perdido, was ceded to the United States, is a question into which this court will not now inquire. The legislative and executive departments of the government have determined that the entire territory was so

ceded. This court have solemnly and repeatedly declared, that this was a matter peculiarly belonging to the cognizance of those departments, and that the propriety of their determination it was not within the province of the judiciary to contravene or question. See the cases of Foster and Elam v. Neilson, 2 Peters, 253, and of Garcia v. Lee, 12 Peters, 511. In the former case the court say, — "If a Spanish grantee had obtained possession of the land in dispute, so as to be the defendant, would a court of the United States maintain his title under a Spanish grant made subsequent to the acquisition of Louisiana, singly on the principle that the Spanish construction of the treaty of St. Ildefonso was right, and the American construction wrong? Such a decision would subvert those principles which govern the relations between the legislative and judicial departments, and mark the limits of each." Substituting the United States as a defendant in the place of a private litigant, (a privilege permitted by the law of 1824,) the case supposed and satisfactorily answered in the quotation just made is in all its features precisely that now before the court; and to sustain the pretensions of the appellee, it is indispensable that the American construction of the treaty of St. Ildefonso be rejected, and the Spanish construction held to be the true one. In the case of Garcia v. Lee, this court say, — "The controversy in relation to the country between the Mississippi and Perdido Rivers, and the validity of the grants made by Spain in the disputed territory after the cession of Louisiana to the United States, were carefully examined, and decided, in the case of Foster and Elam v. Neilson. The Supreme Court in that case decided, that the question of boundary between the United States and Spain was a question for the political department of the government; that the legislative and executive branches having decided the question, the courts of the United States are bound to regard the boundary determined by them to be the true one. That grants made by the Spanish authorities of lands which, according to this boundary line, belonged to the United States, gave no title to the grantees in opposition to those claiming under the United States." Has the law, as expounded in the cases of Foster and Elam v. Neilson, and of Garcia v. Lee, been in any respect changed by the act of 1844? Has that act enlarged the rights of claimants under French or Spanish titles, or restricted the rights of the United States as derived from the treaties of St. Ildefonso and of Paris? Beyond an extension of the modes of proceeding allowed by the act of 1824 to claimants in Missouri, to persons claiming under Spanish, French, or British titles, within the States of Louisi-

La Roche et al. *v.* Jones et al.

ana and Arkansas, and within those portions of the States of Mississippi and Alabama lying south of the thirty-first degree of north latitude, and between the Rivers Mississippi and Perdido, we can perceive no change in the act of 1824 effected by the act of 1844.   We are unable to perceive any addition made by the latter act to the intrinsic strength of the claims allowed to be prosecuted, or any dispensation from proofs of their *bona fides*, or of a single condition prescribed in relation to their origin and character by the act of 1824.   What are the conditions prescribed by this act as indispensable to the allowance and establishment of titles derived from France or Spain has been stated in a previous part of this opinion, and having shown the title of the appellee to be wanting in all those conditions, it is the opinion of this court that his petition should have been rejected,— and therefore that the judgment of the District Court pronounced in this cause should be reversed, and the same is hereby reversed.

### Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the District of Louisiana, and was argued by counsel.   On consideration whereof, it is the opinion of this court, that the title of the petitioner is null and void.   Whereupon it is now here ordered and adjudged by this court, that the judgment of the said District Court in this cause be, and the same is hereby, reversed, and that this cause be, and the same is hereby, remanded to the said District Court, with directions to dismiss the petition of the claimant in this cause.