PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

     *Plaintiff-Appellee,*

v.

SEAN THEODORE BREHM,

     *Defendant-Appellant.*

No. 11-4755

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Anthony J. Trenga, District Judge.
(1:11-cr-00011-AJT-1)

Argued: May 16, 2012

Decided: August 10, 2012

Before TRAXLER, Chief Judge, and KING and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Chief Judge Traxler and Judge Duncan joined.

## COUNSEL

**ARGUED:** Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia, for Appellant. Michael Alan Rotker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Jeffrey C.

Corey, Research and Writing Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Ronald L. Walutes, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Lanny A. Breuer, Assistant Attorney General, John D. Buretta, Acting Deputy Assistant Attorney General, James S. Yoon, Senior Trial Attorney, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Appellee.

---

## OPINION

KING, Circuit Judge:

Sean Theodore Brehm, a citizen of South Africa, pleaded guilty in the Eastern District of Virginia to a federal charge of assault resulting in serious bodily injury, on condition that he be allowed to challenge through appeal the jurisdictional basis of the indictment underlying his conviction. The grand jury accused Brehm of stabbing a British subject, "J.O.," during an altercation at Kandahar Airfield ("KAF"), while both men were employed with private contractors supporting the NATO war effort in Afghanistan.

On appeal, Brehm maintains that the indictment's reliance on the Military Extraterritorial Jurisdiction Act ("MEJA") was misplaced, in that the statute — which Brehm admits is valid on its face — cannot be applied to him in a manner consistent with the Constitution. Brehm also asserts that the government has failed to establish a sufficient nexus between him and the United States to support the exercise of criminal jurisdiction, pointing out that, prior to his arrival in Virginia as an accused, neither he nor his victim had ever set foot in this country. For that and other reasons, according to Brehm, his prosecution does not comport with due process. As described below, we reject Brehm's challenges to his conviction and affirm the district court's judgment.

## I.

KAF is a NATO-operated military base that, in 2010, was home to about 19,000 troops, more than 15,000 of which were American. Brehm was employed by DynCorp International LLC, a domestic military contractor headquartered in Falls Church, Virginia. On Thanksgiving Day, November 25, 2010, Brehm was at KAF to process arriving DynCorp employees, when he encountered J.O. The latter was an employee of Global Strategies Group, a United Kingdom entity also providing support services. J.O. had just returned from a vacation with his American wife, who was likewise employed at KAF. The two men engaged in a heated altercation concerning an ongoing and rancorous dispute, which ended calamitously with Brehm stabbing J.O. in the left arm and stomach, seriously injuring him. Afterward, Brehm was taken into custody by United States military police.

Brehm had signed a "Foreign Service Employment Agreement" with DynCorp in July 2010. The agreement provided, in pertinent part, that Brehm "has been informed of, understands and accepts that [he] may be subject to U.S. . . . federal civilian criminal jurisdiction under the [MEJA] by accompanying the U.S. Armed Forces outside the United States." J.A. 121.[1] Following the filing of a criminal complaint and issuance of an arrest warrant in the Eastern District of Virginia, a magistrate judge telephonically conducted a preliminary hearing, after which Brehm was flown to Alexandria.

The grand jury's indictment ensued on January 5, 2011, charging Brehm in Count One with assault with a dangerous weapon, in contravention of 18 U.S.C. § 113(a)(3), and in Count Two with assault resulting in serious bodily injury, as proscribed by 18 U.S.C. § 113(a)(6). The offenses described in the respective counts constitute federal crimes when com-

---

[1]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.

mitted "within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 113(a). The indictment also referenced MEJA, which incorporates § 113(a)(6) (and many other criminal provisions) by specifying:

> Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States . . . while employed by or accompanying the Armed Forces outside the United States . . . shall be punished as provided for that offense.

18 U.S.C. § 3261(a). MEJA defines persons "employed by the Armed Forces outside the United States" to include employees of contractors or subcontractors of the Department of Defense ("DOD"). *See id.* § 3267(1)(A)(iii).

Brehm promptly filed a pair of motions seeking dismissal of the indictment. The first motion, on February 25, 2011, asserted that "Brehm's connection to the United States is so lacking" that the district court could not, "consistent with the requirements of the Due Process Clause, exercise jurisdiction under MEJA." J.A. 19. The second, on March 4, 2011, insisted that MEJA, as applied to Brehm, was unconstitutional in that "the framers did not grant Congress the power to police routine assaults between foreigners that occur abroad and do not harm the United States." *Id.* at 44. The court conducted a hearing on the motions on March 29, 2011, and it denied them both by memorandum opinion the following day. *See United States v. Brehm*, No. 1:11-cr-00011 (E.D. Va. Mar. 30, 2011) (the "Opinion").[2]

Facing trial on the indictment, Brehm agreed with the government to conditionally plead guilty to Count Two in return

---

[2]The unpublished Opinion is found at J.A. 167-82.

for, inter alia, being permitted to appeal the district court's denial of his motions to dismiss. *See* Fed. R. Crim. P. 11(a)(2). On April 12, 2011, the court accepted the plea and dismissed Count One of the indictment. For his conviction on Count Two, Brehm was sentenced on July 8, 2011, to forty-two months in prison. By timely notice filed July 21, 2001, Brehm appeals.

## II.

On appeal of a motion to dismiss an indictment, we review de novo the district court's legal analysis. *See United States v. Pasquantino*, 305 F.3d 291, 294 (4th Cir. 2002). In so doing, we accept any facts found by the court as conclusive except insofar as those findings are shown to be clearly erroneous. *Id.* The parties to this appeal have stipulated to the material underlying facts, presenting us with pure questions of law.

## III.

### A.

Brehm does not contest the constitutionality of MEJA on its face.[3] Rather, he "acknowledges that under some circumstances . . . Congress might have authority to criminalize acts of foreign nationals" as set forth in the statute. Br. of Appellant 30 n.3. Brehm suggested to the district court that he would have been susceptible to prosecution under MEJA had he, for example, "assaulted a member of the United States armed forces or defrauded the United States government," J.A. 43, but he hastens to point out that such hypothetical facts are "not present here." Br. of Appellant 30 n.3.

---

[3]To prevail on a facial challenge, Brehm would be compelled to demonstrate "that no set of circumstances exists" under which MEJA could be constitutionally valid. *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Accordingly, Brehm downplays his bloody encounter with J.O. as "a minutes-long fight" culminating in "a run-of-the-mill assault . . . over a personal dispute in a foreign country." Br. of Appellant 31-33. Brehm emphasizes that neither he nor the victim are American citizens, and he maintains that he "was not acting in furtherance of his DynCorp job duties when he assaulted J.O." *Id.* at 35.

Insofar as the circumstances surrounding Brehm's conduct may be described as varying in some respects from the hypothetical situations he concedes manifest constitutional applications of MEJA, such distinctions produce no real difference. The enumerated powers granted Congress by Article I, Section 8 of the Constitution are of sufficient reach to encompass any of the scenarios articulated above, including Brehm's. Of particular relevance here is Congress's express authority to "raise and support Armies." U.S. Const. art. I, § 8, cl. 12. More generally, Congress is entitled to "make all Laws which shall be necessary and proper" to adequately support our armed forces. U.S. Const. art. I, § 8, cl. 18; *see Rostker v. Goldberg*, 453 U.S. 57, 65 (1981) (observing that congressional authority "to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping").[4] Armies, by their very nature, must be expected to operate in foreign lands, and their need for support does not end at our borders.

Contrary to the impression Brehm seeks to convey, it is not

---

[4]In its report on MEJA, the House of Representatives Committee on the Judiciary invoked the Necessary and Proper Clause in conjunction with several other enumerated powers as bases for the statute's enactment, including those permitting Congress to "define and punish . . . Offenses against the Law of Nations"; to "make Rules for the Government and Regulation of the land and naval Forces"; and to "provide for organizing, arming, and disciplining, the Militia, and for governing such part of them as may be employed in the Service of the United States." U.S. Const. art. I, § 8, cl. 10, 14, 16 (cited at H.R. Rep. No. 106-778(I), at 14 (2000), 2000 WL 1008725, at *14).

unusual that a foreign citizen is called to answer in an American court for his alleged criminal wrongdoing, as that occurs routinely with respect to crimes committed within our nation's borders. Indeed, the government dryly observed before the district court that "[t]he U.S. Bureau of Prisons is filled with foreign nationals, Your Honor." J.A. 162. And, presumably, in the vast majority of such proceedings, the identity or citizenship of the victim matters not.

The crux of Brehm's complaint, then, cannot be that his citizenship — or that of his victim — is "foreign" vis à vis the United States, but that, against that backdrop, his alleged crime occurred in a place foreign both to him and to the prosecuting sovereign. The latter, of course, is precisely what MEJA contemplates by its specific application to "conduct outside the United States." 18 U.S.C. § 3261(a).[5] Furthermore, it could hardly have been unanticipated by Congress that at least some persons employed overseas by DOD contractors or subcontractors would not be American citizens.

It is Brehm's status as an employee of DynCorp that brings his actions at KAF within the criminal misconduct that MEJA was enacted to govern; his status as a "foreign" employee is irrelevant, as are the attributes of the victim. It may well have been the case, as Brehm asserts, that his assault of J.O. was undertaken outside the scope of his employment. Rarely, we think, would a private employer include vicious attacks on third parties within an employee's job description. Had it not

---

[5]The proposition that federal crimes are punishable though committed outside of the United States is not controversial, at least insofar as such prosecution is consistent with the law of nations and so long as the enactment evidences Congress's intent to extend its extraterritorial reach. *See United States v. Bowman*, 260 U.S. 94, 97-98 (1922). Indeed, in certain instances, Congress has been held unbound by international law, *see United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003), and its silence on extraterritoriality not determinative with respect to "'criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction,'" *id.* (quoting *Bowman*, 260 U.S. at 98).

been for his employment by DynCorp, however, Brehm would have been nowhere near KAF, and he would have had no opportunity to commit the offense of conviction.

The district court, for its part, took a somewhat different view, ruling that MEJA's legitimacy inheres in Congress's constitutional role as the sole legislative authority "with respect to affairs external to the boundaries of the United States . . . based on national sovereignty." Opinion 13.[6] We offer no opinion as to the federal government's implied powers or the accuracy of the analysis below, in that we reach the same result on de novo review by resort to the express authority granted Congress by the Constitution. *See United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) (observing that appellate review "not limited to evaluation of the grounds offered by the district court to support its decision," and that we "may affirm on any grounds apparent from the record"). MEJA is constitutional as applied in Brehm's case.

## B.

Though a criminal statute having extraterritorial reach is declared or conceded substantively valid under the Constitution, its enforcement in a particular instance must comport with due process. Some courts have, as a proxy for due process, required "a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990) (citation omitted); *see also United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003).[7] The

---

[6]*See also United States v. Williams*, 722 F. Supp. 2d 1313, 1317-18 (M.D. Ga. 2010) (deeming enumerated powers analysis irrelevant to MEJA facial challenge, based on conclusion that Article 1, Section 8 relates solely to allocation of state and federal authority, with such authority in realm of international affairs reposed wholly in latter (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315-16 (1936))).

[7]Although we find the analyses of those courts instructive, we need not decide, in this case, whether a showing of sufficient nexus is either adequate or required to satisfy due process in the prosecution of a foreign national in U.S. courts.

court of appeals in *Davis* concluded that the requisite nexus was present in a prosecution under the Maritime Drug Law Enforcement Act ("MDLEA"), where the British defendant and his boat were seized off the coast of California while attempting to smuggle marijuana into the United States. *See* 905 F.2d at 249. In *Yousef*, the Second Circuit arrived at the same result with respect to Middle Eastern terrorists tried for multiple federal crimes associated with their plot to bomb American commercial aircraft in Southeast Asia. *See* 327 F.3d at 118.

It is undoubtedly the case that, unlike the defendants in *Davis* and *Yousef*, Brehm did not target his conduct toward American soil or American commerce. Nevertheless, his actions affected significant American interests at KAF, not the least of which were the preservation of law and order on the base, the maintenance of military-related discipline, and the reallocation of DOD resources to confine Brehm, provide care for J.O., and investigate the incident. Indeed, Brehm's very presence inside KAF was possible only pursuant to an official DOD Letter of Authorization, entitling him to DOD-furnished transportation, meals, and equipment. Although KAF was not technically territory of the United States, the American influence was so pervasive that we think it a suitable proxy for due process purposes, such that the imposition of American criminal law there is not arbitrary.

On occasion, the connection between the United States and a putative criminal defendant may properly be more fluid, as was the case in *United States v. Angulo-Hernandez*, 565 F.3d 2 (1st Cir. 2009). In *Angulo-Hernandez*, a MDLEA prosecution, the court of appeals rejected the challenge of drug smugglers whose Bolivian-flagged boat was intercepted by the Coast Guard in international waters. The smugglers were prosecuted pursuant to an agreement between the United States and Bolivia to enforce the former's drug laws against the latter's maritime fleet members. Under the circumstances, the First Circuit had little difficulty concluding that due pro-

cess is satisfied even absent a discernible jurisdictional nexus where "the flag nation has consented to the application of United States law to the defendants." *Id.* at 11.

The American presence at KAF and throughout Afghanistan is regulated in part by a written arrangement similar in respects to the one in *Angulo-Hernandez. See* Agreement regarding the Status of United States Military and Civilian Personnel of the U.S. Department of Defense Present in Afghanistan in connection with Cooperative Efforts in Response to Terrorism, Humanitarian and Civic Assistance, Military Training and Exercises, and Other Activities, U.S.-Afg., May 28, 2003, 42 I.L.M. 1500, 2003 WL 21754316 [hereinafter the "Agreement"]. Within the Agreement, the Afghan government, in recognition of "the particular importance of disciplinary control by the United States military authorities," authorized the American government "to exercise its criminal jurisdiction over the personnel of the United States." 2003 WL 21754316, at *4.[8]

The Agreement refers to "personnel" without limiting the term to those serving in the military, and without purporting to exclude civilians. It is reasonable, then, to interpret "personnel of the United States" to include employees of DynCorp and other American contractors and subcontractors. With Afghanistan having disclaimed any interest in prosecuting criminal conduct at KAF by those situated similarly to Brehm, due process is not offended by the United States stepping into the jurisdictional void. Indeed, absent the credible threat of American prosecution of civilian crimes at KAF, it is conceivable that such conduct would go unpunished. The risk of that sort of random lawlessness is readily seen as inimical to the success of the military mission in Afghanistan, and thus con-

---

[8]The Agreement was not in the record before the district court, but it nevertheless is a public act or proclamation comprising "historical and notorious facts, of which the court can take regular judicial notice." *United States v. Reynes*, 50 U.S. 127, 147-48 (1850).

trary to the American interest in that mission. Insofar as the enactment of MEJA serves to legitimately advance that interest, its application is unlikely to be arbitrary.

Nor do we perceive any inherent unfairness in Brehm's prosecution. In that regard, *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011), is instructive. In *Al Kassar*, the Second Circuit considered the appeals of foreign arms dealers arrested and brought to the United States for trial. The defendants stood accused of numerous crimes, including a conspiracy to kill American citizens and federal officers or employees. The conspiracy accusations were based on the defendants' discussions with undercover DEA agents to sell surface-to-air missiles and other weapons for use against the U.S. military in Columbia. In addressing the defendants' due process argument premised on unfairness, the court of appeals observed:

> Fair warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere. The defendants were not ensnared by a trap laid for the unwary. Supplying weapons illegally . . . to a known terrorist organization with the understanding that those weapons would be used to kill U.S. citizens and destroy U.S. property is self-evidently criminal.

660 F.3d at 119.

Brehm reasonably should have been under a similar understanding when it came to stabbing J.O., all the more so in light of the relevant provisions of his employment contract with DynCorp. Brehm's acknowledgement and acceptance of the warnings therein regarding the criminal jurisdiction

asserted by the United States constituted notice of the same sufficient to dispel any surprise.

## IV.

In accordance with the foregoing, we affirm Brehm's conviction in the district court.

*AFFIRMED*