WILLIAMS, Circuit Judge,
joined by ROVNER and HAMILTON, Circuit Judges, dissenting.
I join Judge Hamilton’s and Judge Rovner’s dissenting opinions in full, as well as Judge Wood’s concurrence in all but Part III. I write separately to voice my own concerns with the majority decision.
Applying Bivens to (even arguably) novel factual scenarios has always required a delicate balance of competing considerations. But in the effort to wall off high officials’ bank accounts, the majority appears to have erected a sweeping, unprecedented exemption from Bivens for military officers. No case from our highest court or our sister circuits has approached such a sweeping conclusion. The vagueness of the majority’s analysis makes the actual scope of the exemption unclear. Does the new immunity apply only to the highest officials in the chain of command? To suits brought by security contractors in a conflict zone? As for the doctrine of Bivens itself, the majority’s reservations about this constitutional bulwark are transparent. That should not matter. “The Supreme Court alone is entitled to declare one of its decisions defunct ... [e]ven if later decisions wash away the earlier one’s foundation.... ” United States v. Booker, 375 F.3d 508, 516 (7th Cir.2004) (Easterbrook, J., dissenting) (citing State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) and Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 *227 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). Whatever the status of Bivens, this decision sweeps too broadly and vaguely, and so I must dissent.
I.
The majority states that “[w]hat plaintiffs want is an award of damages premised on a view that the military command structure should be different — that, for example, the Secretary of Defense must do more (or do something different) to control misconduct by interrogators and other personnel on the scene in foreign nations.” Op. at 200. The characterization misrepresents the nature of this suit. The plaintiffs are not asking the courts to give Rumsfeld a poor performance evaluation as Secretary of Defense. They are suing him for personally and intentionally violating their fundamental rights as American citizens. Nor does the complaint seek to alter the “military command structure.” No count requests an injunction or declaratory judgment regarding military discipline, the chain of command, or the policies employed by Rumsfeld or his subordinates. Cf. Lebron v. Rumsfeld, 670 F.3d 540, 546 (4th Cir.2012) (plaintiff principally sought to enjoin his designation as an enemy combatant, requesting nominal damages from defendants).
What plaintiffs assert is: (1) they were tortured in violation of the Constitution and laws of the United States; (2) Rumsfeld is personally liable because he authorized their torture and made case-specific determinations about who would receive “enhanced” treatment after it was made clear that his detention policies were illegal; and (3) plaintiffs should receive monetary damages for the abuse they endured in military custody. Vance and Ertel do not want to remake military policy through the judiciary. Frankly, there is little need to do so because Congress has already directly addressed and outlawed the detention practices inflicted on these plaintiffs. Instead, the allegation before us is willful, directed non-compliance with the law. The majority may believe that Rumsfeld’s actions were merely negligent and that may be true. But that is not the allegation.
Having misinterpreted the complaint, the majority next misreads the Supreme Court’s opinions in Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), and United States v. Stanley, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987). It is suggested that in these decisions, “[t]he Supreme Court’s principal point was that civilian courts should not interfere with the military chain of command ... [because] military efficiency depends on a particular command structure, which civilian judges easily could mess up without appreciating what they were doing.” Op. at 199. Judge Hamilton comprehensively explains why the majority has incorrectly applied the precedent. I would only add that Stanley explicitly addressed the scope of the decision, as well as the potential “levels of generality at which one may apply ‘special factors’ analysis”:
Most narrowly, one might require reason to believe that in the particular case the disciplinary structure of the military would be affected — thus not even excluding all officer-subordinate suits, but allowing, for example, suits for officer conduct so egregious that no responsible officer would feel exposed to suit in the performance of his duties. Somewhat more broadly, one might disallow Bivens actions whenever an officer-subordinate relationship underlies the suit. More broadly still, one might disallow them in the officer-subordinate situation and also beyond that situation when it affirmatively appears that military disci *228 pline would be affected. (This seems to be the position urged by Stanley.) Fourth, as we think appropriate, one might disallow Bivens actions whenever the injury arises out of activity “incident to service.” And finally, one might conceivably disallow them by servicemen entirely.
483 U.S. at 681, 107 S.Ct. 3054 (emphasis added). Here, Stanley describes its principal point unambiguously: Members of the military cannot invoke Bivens for injuries arising out of “activity incident to service.” Indeed, the Court reserved the possibility of Bivens suits by servicemen against military officials in other contexts. Despite Stanley’s clarity, the majority contends that the Supreme Court actually meant to bar any suit, even by civilians, that “interfered with the military chain of command.” I cannot tell what this purported standard means. But it goes well beyond what the Supreme Court has expressly identified as a bridge too far. Can there be a clearer indication of error?
At heart, in Chappell and Stanley, the Supreme Court did not want to permit service members to litigate what are effectively employment disputes against superiors through the federal courts rather than through the military’s internal channels. See Chappell, 462 U.S. at 303-05, 103 S.Ct. 2362 (barring race discrimination claim). That rationale does not apply here.[1] Cf. id. at 300, 103 S.Ct. 2362 (“Civilian courts must ... hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment.” (emphasis added)). This court’s decision leaves unexplained how or why a suit by an American civilian, with no connection to the chain of command, would interfere with military discipline in the manner anticipated by Chappell and Stanley.[2]
Even if judicial participation might interfere in some other way, there is a further irony underlying the majority’s approach. The opinion recognizes that injunctive relief against illegal military conduct is already available under estab *229 lished doctrine. See Op. at 202 (“Injunctions that enforce the Detainee Treatment Act prospectively may be possible under the doctrine of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), or the waiver of sovereign immunity in 5 U.S.C. § 702.”). This point was also raised at oral argument where the parties agreed that the judiciary retains the power to enjoin an unconstitutional practice or unlawful deprivation of rights. Do such suits “interfere” with the military command structure or the chain of command? They certainly would seem to. So, to the extent that the majority fears judicial scrutiny of military policy, that state of affairs is already upon us and is sanctioned by this decision itself.
The Supreme Court requires us to exercise judicial review in various circumstances impacting national security. See, e.g., Hamdi v. Rumsfeld, 542 U.S. 507, 536, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (“[A] state of war is not a blank check for the President when it comes to the rights of the Nation’s citizens.... Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake.”); Mitchell v. Forsyth, 472 U.S. 511, 523, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (“[Djespite our recognition of the importance of [the Attorney General’s activities in the name of national security] to the safety of our Nation and its democratic system of government, we cannot accept the notion that restraints are completely unnecessary.”); Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (“[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.”); Home Bldg. & Loan Ass’n v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (“[E]ven the war power does not remove constitutional limitations safeguarding essential liberties.”). Executive power to protect national security or conduct foreign affairs does not deprive the judiciary of its authority to check abuses that violate individual rights. Judicial review may be deferential to the interests of national security, Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24, 26, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), but it remains necessary. Habeas corpus review certainly interferes with the military’s assessment of national security priorities. No matter. Our constitutional system requires the judiciary’s participation. Boumediene v. Bush, 553 U.S. 723, 765, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (“[T]he political branches [do not] have the power to switch the Constitution on or off at will.... ”).
I do not mean that actions for money damages must be treated identically to actions for prospective relief. The remedies are distinct. But this puts into sharp perspective the majority’s implication that there is a categorical ban on “judicial intrusion into military affairs.” The judiciary is already intertwined in the constitutional review of military determinations. It is inconsistent to consider federal courts competent on the one hand to balance policy concerns associated with injunctive relief (as the majority must concede), while treating these courts as unqualified to address actual injury to citizens caused by official abuse. Traditionally, damages actions have been viewed as less intrusive than injunctive relief because they do not require the court to engage in operational decision-making. Compare Gilligan v. Morgan, 413 U.S. 1, 11, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (rejecting a suit seeking judicial supervision of the operation and training of the Ohio National Guard in the wake of the Kent State shootings) with *230 id. at 5, 93 S.Ct. 2440 (suggesting that a damages action against the National Guard could be justiciable) and Scheuer v. Rhodes, 416 U.S. 232, 247-49, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (permitting such a suit). True, courts make mistakes, but this has little to do with the propriety of Bivens. Every government institution errs, including the military. The point of judicial participation is not infallibility but independence and neutrality, something executive entities do not have when evaluating their own officers’ conduct.
For these reasons, I cannot accept the majority’s rationale for rejecting Bivens in this context. The majority pins much of its reasoning on the Lebrón decision but does not mention any of the relevant details. The Lebrón suit was brought on behalf of Jose Padilla, an individual designated as an enemy combatant by the President and later convicted of criminal terrorism charges. Padilla’s proposed Bivens action sought a judicial declaration that his designation as an enemy combatant and resulting detention were unconstitutional. The Lebrón court rejected the claim on separation-of-powers grounds reasoning that in identifying terrorists, the President acted with express congressional approval under the Authorization for Use of Military Force, Pub.L. No. 107-40, 115 Stat. 224 (2001).
Whatever the merits of Lebrón, it is disingenuous to suggest that the same analysis applies in this case. The majority endeavors to stretch a blanket of immunity over the entire “military chain of command” in an effort to cover the very different facts presented here. Vance and Ertel do not challenge their status and detention as enemy combatants; they could not do so because they never received such a designation. And far from authorizing their treatment, Congress and the President acted twice to outlaw it through the National Defense Authorization Act and the Detainee Treatment Act (“DTA”). 10 U.S.C. § 801 note. The complaint charges the defendant with intentionally acting in derogation of the newly enacted laws to retain and administer illegal interrogation practices, approving them on an individualized basis. These allegations may not be true. But if they are true, I cannot agree that the separation of powers bars a citizen’s recovery from a rogue officer affirmatively acting to subvert the law. That is a quintessential scenario where Bivens should function to enforce individual rights.
Every member of this court recognizes that the job of the military is challenging, dangerous, and critical to our national security. For these reasons and more, members of the armed forces enjoy unparalleled respect in our society. But this respect does not put the military’s highest officers beyond the reach of the Constitution or adjudication by Article III courts. We would abdicate our duty if we permit Bivens to become a mirage. If it is an illusion, it is a dangerous one because it has tricked not only plaintiffs, but the other branches of our government into relying upon it. Congress created in the DTA a limited, good-faith defense against Bivens meant to be available in situations precisely like this one. And the State Department pointed to Bivens suits as evidence that we take seriously our commitments to preventing torture. The majority suggests that the other branches of government were only leaping at shadows. But we have an independent obligation to individual citizens and to the Constitution to apply the precedent even in difficult cases. Otherwise we risk creating a doctrine of constitutional triviality where private actions are permitted only if they cannot possibly offend anyone anywhere. That approach undermines our essential constitutional protections in the circum *231 stances when they are often most necessary. It is no basis for a rule of law.
II.
Whether the plaintiffs have adequately pled Rumsfeld’s personal liability for violations of clearly established law is also a delicate question. Arguably qualified immunity should shoulder more of the burden of the majority’s demonstrable hesitation to hold high government officials accountable for constitutional violations. Cf. Padilla v. Yoo, 678 F.3d 748, 768 (9th Cir.2012) (disposing of suit on qualified immunity grounds rather than affording total immunity to Bivens). Nevertheless, I agree with my dissenting colleagues that the plaintiffs’ complaint should survive. This complaint is unusually detailed and alleges Rumsfeld’s personal participation in interrogation determinations, something the majority ignores. It is plausible (if not necessarily probable) to infer from Rumsfeld’s direct involvement in developing interrogation practices at Camp Cropper and his case-specific approval of techniques used on detainees that he personally authorized the plaintiffs’ abuse or remained intentionally indifferent to it. These allegations go well beyond those deemed insufficient in Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), and present more than a mere possibility of liability. Therefore, I would permit the suit to continue to at least limited discovery. See, e.g., Crawford-El v. Britton, 523 U.S. 574, 593 n. 14, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).
I respectfully dissent.

. The majority entertains the idea that the plaintiffs, as security contractors, might be considered equivalent to soldiers anyway when evaluating the availability of a Bivens action. But this is a distraction. The individuals in United States v. Brehm, 691 F.3d 547 (4th Cir.2012) and United States v. Ali, 71 M.J. 256 (C.A.A.F.2012) were effectively employees of the United States military, subcontracted through American companies. Notably, this was the same scenario in Doe v. Rumsfeld, 683 F.3d 390, 392 (D.C.Cir.2012), where the court treated a defense contractor employee as equivalent to a serviceman because he was working for the United States military. This case is different. When Vance and Ertel were detained and tortured, they worked for Shield Group Security, an Iraqi corporation which provided security contracts to the government of Iraq and private companies. The plaintiffs do not appear to have had a connection to the United States government beyond being American citizens. At very least, a reading of the complaint in the light favorable to plaintiffs cannot support an employment relationship with the United States military. The majority further suggests that security contractors are inherently similar to soldiers. Perhaps this is true in the sense that a mall guard is like a homicide detective. But Vance and Ertel’s job descriptions have no bearing on the availability of Bivens in this case.

. As Judge Hamilton notes, the majority altogether ignores the Supreme Court's contradictory analysis in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), which treated a civilian’s excessive force suit against a military officer as permissible (though barred in that case by qualified immunity). Saucier was decided well after Stanley and Chappell. If the Supreme Court had been concerned all along with the threat posed by civilian suits to the chain of command, why didn't it say so?