**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4235**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

EDGAR JAVIER BELLO MURILLO, a/k/a Payaso,

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Gerald Bruce Lee, District Judge.  (1:13-cr-00310-GBL-3)

Argued:  January 28, 2016               Decided:  June 14, 2016

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Niemeyer and Judge Duncan joined.

**ARGUED**: John Cady Kiyonaga, LAW OFFICE OF JOHN C. KIYONAGA, Alexandria, Virginia, for Appellant.  Ross Brandon Goldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:** Stacey K. Luck, Human Rights & Special Prosecutions Section, Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, Criminal Division, Appellate Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dana J. Boente, United States Attorney, Richard Cooke, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

KING, Circuit Judge:

Defendant Edgar Javier Bello Murillo appeals his convictions in the Eastern District of Virginia arising from the murder in South America of Special Agent James Terry Watson of the Drug Enforcement Administration (the "DEA"). At the time of his death, Agent Watson — as an Assistant Attaché for the United States Mission in Colombia — was an internationally protected person (an "IPP"). Bello, a citizen of Colombia, has not contested his involvement in crimes against Watson. Indeed, Bello pleaded guilty to offenses of kidnapping conspiracy and murder of an IPP. He reserved the right to pursue this appeal, however, on the ground that his prosecution in this country for offenses committed in Colombia contravened the Fifth Amendment's Due Process Clause. As explained below, we affirm Bello's convictions.

I.

A.

Agent Watson began serving the DEA in the year 2000, having previously worked as a Sheriff's Deputy in Louisiana and as a Deputy United States Marshal in Mississippi.[1] In July 2010, the

---

[1] As part of his plea agreement with the United States Attorney, Bello stipulated to facts regarding his involvement in
(Continued)

DEA assigned Watson to its field office in Cartagena, Colombia. That same month, Watson was accredited by the United States and Colombia as an Assistant Attaché for the United States Mission in Colombia. By virtue of his diplomatic status, Watson became an IPP and was thereby protected by the Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents (the "IPP Convention," or the "Convention"), opened for signature Dec. 14, 1973, 28 U.S.T. 1975, 1035 U.N.T.S. 167.[2]

Bello drove a taxicab in Bogotá, Colombia, where he conspired with other taxi drivers to mug and rob wealthy passengers through "paseo millionario" ("millionaire's ride") armed robberies. The conspirators would execute their robbery schemes through a series of choreographed maneuvers. First, one taxi driver would pick up an affluent-looking customer and then signal to the others. Next, another taxicab containing additional conspirators would pull in behind the first. Armed with weapons such as tasers and knives, the conspirators from the second taxicab would enter the first and rob its passenger.

---

Agent Watson's murder. We draw our factual recitation from the record and that statement of facts.

[2] The United States signed the IPP Convention on December 28, 1973. The Convention became effective on February 20, 1977, and Colombia adopted it on January 16, 1996.

The assailants would demand from the victim his cash, valuables, credit cards, and personal-identification numbers for bank accounts. Typically, another conspirator — in yet a third taxicab — would support the robbery efforts by blocking traffic, acting as a lookout, or using the victim's bank cards to withdraw cash.

On or about June 20, 2013, a taxicab operated by one of Bello's coconspirators picked up Agent Watson in Bogotá. Carrying a knife, Bello rode in a second taxicab with his codefendant Edwin Gerardo Figueroa Sepulveda. After travelling a short distance with Agent Watson, the driver of the first taxicab pretended that his vehicle was experiencing mechanical problems and stopped, allowing the second taxicab to pull in behind. Bello and Figueroa Sepulveda then exited the second taxicab and entered the first to rob Watson. Inside, Figueroa Sepulveda tased Watson, and Bello stabbed the American diplomat at least four times. Watson ultimately escaped from his assailants, but he later died from the stab wounds. Within a few days, Bello was arrested in Colombia.

B.

1.

On July 18, 2013, the federal grand jury in Alexandria, Virginia, returned an indictment against six defendants, including Bello and lead defendant Figueroa Sepulveda, for their

4

involvement in Agent Watson's murder.  In pertinent part, the indictment charged Bello with four offenses:  murder of an IPP, in contravention of 18 U.S.C. § 1116(a) ("Count 1"); murder of an officer and employee of the United States, in violation of 18 U.S.C. § 1114 ("Count 2"); conspiracy to kidnap an IPP, in contravention of 18 U.S.C. § 1201(c) ("Count 3"); and kidnapping an IPP, in violation of 18 U.S.C. § 1201(a) ("Count 4").  Counts 1, 2, and 4 included allegations of aiding and abetting under 18 U.S.C. § 2.

On August 22, 2013, the United States requested Bello's extradition from Colombia for prosecution in the Eastern District of Virginia.  Pursuant to Colombia's obligations under the IPP Convention, the Colombian Minister of Justice and Law referred the extradition request to Colombia's Supreme Court of Justice.  On April 2, 2014, that court ruled that Bello could be extradited to the United States for prosecution on Counts 1, 3, and 4 — the alleged offenses against an IPP — but not on Count 2.

Thereafter, by an executive resolution of June 18, 2014, the Colombian Minister of Justice and Law — acting on behalf of the President of Colombia — ordered Bello's extradition to the United States for prosecution on Counts 1, 3, and 4, and denied the extradition request as to Count 2.  In so ruling, the Minister relied on the Colombian court decision, observing that

5

"the crime must be considered as committed not only in the place where the events physically happened but also in the territory of the United States of America," which "has the right to claim jurisdiction to investigate and try the conduct that affected its key interests." See United States v. Figueroa Sepulveda, No. 1:13-cr-00310 (E.D. Va. Feb. 18, 2015), ECF No. 292-1, at 29-30 (internal quotation marks and footnote omitted).[3] Bello was thereafter extradited to this country and first appeared in the Eastern District of Virginia on July 2, 2014. Two weeks later, the district court dismissed Count 2 as to him.

2.

Invoking the "notice requirement" of the Fifth Amendment's Due Process Clause, Bello sought dismissal of the three charges on which he had been extradited. See United States v. Figueroa Sepulveda, No. 1:13-cr-00310 (E.D. Va. Sept. 15, 2014), ECF No. 119, at 1. Critical to Bello's argument was that the government did "not allege (nor, apparently, could it based on the known facts) that the conduct in this case was intentionally directed at a United States citizen, much less an agent of the United

---

[3] The June 18, 2014 executive resolution of the Colombian Minister of Justice and Law ordering Bello's extradition to this country is contained in materials the Colombian government provided to the U.S. Embassy in Bogotá. The United States Attorney filed certified translations of those materials in the district court proceedings.

6

States Government." Id. at 5-6. Bello contended that, "[a]bsent a specific intent to harm American people, property or interests, or knowledge that [his] conduct would do so, it is fundamentally unfair and inconsistent with American notions of due process for [him] to be tried in an American court." Id. at 6.

As explained in its opinion of November 6, 2014, which relied primarily on our recent decision in United States v. Brehm, 691 F.3d 547 (4th Cir. 2012), the district court denied the dismissal motion. See United States v. Figueroa Sepulveda, 57 F. Supp. 3d 618 (E.D. Va. 2014). In so doing, the court ruled that Bello's "due process rights are not violated by prosecuting him in the United States for the murder and kidnapping of [Agent Watson] because exercising extraterritorial jurisdiction for these offenses is proper under the Fourth Circuit's test set forth in Brehm." Id. at 620. Applying the Brehm test, the court concluded that Bello's prosecution in the United States was neither arbitrary nor unfair, because Bello's offenses affected a "significant American interest," id. at 622, and he had "ample reason to anticipate being prosecuted for his conduct 'somewhere,'" id. at 623.

3.

In December 2014, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, Bello executed his plea agreement with

7

the United States Attorney, agreeing to enter conditional pleas of guilty on Counts 1 and 3. The plea agreement reserved to Bello "the right to appeal the Court's adverse determination concerning the defendant's Motion to Dismiss for Violation of the Notice Requirement of the Fifth Amendment Due Process Clause (Docket No. 119)." See United States v. Figueroa Sepulveda, No. 1:13-cr-00310 (E.D. Va. Dec. 19, 2014), ECF No. 257, at 6 ¶ 7. The plea agreement specified that "Count 1 charges the defendant with aiding and abetting the murder of an [IPP]," in contravention of 18 U.S.C. §§ 1116(a) and 2, and further explained that "Count 3 charges the defendant with conspiracy to kidnap an [IPP]," in violation of 18 U.S.C. § 1201(c). Id. at 1 ¶ 1. On December 19, 2014, the district court conducted a Rule 11 hearing. At the hearing, Bello entered guilty pleas on Counts 1 and 3. In exchange, the government moved to dismiss Count 4 as to him. The court dismissed Count 4 and approved the plea agreement.

On April 16, 2015, the district court sentenced Bello to concurrent sentences of 440 months in prison on Counts 1 and 3. Bello timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

Bello's sole claim on appeal is that his prosecution in the United States contravened the Fifth Amendment's Due Process Clause. We review de novo a properly preserved constitutional claim. See United States v. Hall, 551 F.3d 257, 266 (4th Cir. 2009).

A.

The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." See U.S. Const. amend. V. In our Brehm decision, we recognized that the enforcement of an extraterritorial statute "in a particular instance must comport with due process." See United States v. Brehm, 691 F.3d 547, 552 (4th Cir. 2012).[4] We also observed that certain of our sister circuits approach the due process inquiry by asking whether there is "a sufficient nexus between the defendant and the United States," so that applying a particular statute to the accused "would not be arbitrary or fundamentally unfair." See id. (internal quotation

---

[4] Bello does not contest the district court's ruling that the statutes underlying his convictions on Counts 1 and 3 apply extraterritorially, i.e., they reach offenses committed outside the United States. See Figueroa Sepulveda, 57 F. Supp. 3d at 620 (recognizing that "[t]he plain language of the[] statutes rebuts the presumption against extra-territoriality by codifying Congress' intent that extraterritorial jurisdiction be applied regardless of where the offenses occur" (relying on E.E.O.C. v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991))).

marks omitted) (citing United States v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003); United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990)).  We then assessed the constitutionality of Brehm's prosecution under that arbitrary-or-unfair framework.

Here, the district court employed the same arbitrary-or-unfair framework, and the parties accede to its applicability in this appeal.  We are content to utilize that framework today.  Pursuant thereto, we agree with Bello's concession at oral argument that his criminal prosecution in the United States was not arbitrary.  As we indicated in Brehm, it is not arbitrary to prosecute a defendant in the United States if his "actions affected significant American interests" — even if the defendant did not mean to affect those interests.  See 691 F.3d at 552-53.  Certainly, the United States has a significant interest in protecting its diplomatic agents while they represent this country abroad, and that very interest was affected by Bello's crimes against Agent Watson.

Bello's due process claim thus rests solely on the premise that his prosecution in this country was fundamentally unfair, because he did not know that Agent Watson was an American IPP and thus could not have foreseen being haled into a United States court for the offenses he committed in Colombia.  We explained in Brehm, however, that "[f]air warning does not require that the defendants understand that they could be

10

subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." See 691 F.3d at 554 (quoting United States v. Al Kassar, 660 F.3d 108, 119 (2d Cir. 2011)); see also United States v. Ali, 718 F.3d 929, 944 (D.C. Cir. 2013) ("What appears to be the animating principle governing the due process limits of extraterritorial jurisdiction is the idea that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" (quoting Bouie v. City of Columbia, 378 U.S. 347, 351 (1964))).

Simply put, a defendant is "not ensnared by a trap laid for the unwary" when he has engaged in conduct that "is self-evidently criminal." See Brehm, 691 F.3d at 554 (quoting Al Kassar, 660 F.3d at 119). Because kidnapping and murder are "self-evidently criminal," it was not fundamentally unfair to prosecute Bello in the United States. Accord Brehm, 691 F.3d at 554 (concluding that prosecution in United States was not fundamentally unfair where South African defendant working for American contractor stabbed British victim at NATO-operated military base in Afghanistan); Al Kassar, 660 F.3d at 119 (same where foreign defendants supplied weapons to known terrorist organization overseas for use against U.S. citizens and

11

property).    Absent  fundamental  unfairness,  Bello's  Fifth
Amendment due process claim fails under Brehm.

B.

Brehm also supports the proposition that the IPP Convention alone gave Bello notice sufficient to satisfy due process.    In Brehm, the South African defendant was prosecuted in this country for stabbing his British victim at Kandahar Airfield, where the heavy American presence was regulated in part by a written agreement in which the Afghan government authorized ours "to exercise its criminal jurisdiction over the personnel of the United States."    See 691 F.3d at 553 (internal quotation marks omitted).    Moreover, Brehm had signed an agreement with the American military contractor that employed him acknowledging the United States' criminal jurisdiction.    See id. at 549.    We concluded that Brehm should have reasonably understood that he was subject to prosecution somewhere for the stabbing, "all the more so in light of the relevant provisions of his employment contract."    See id. at 554.    That is, not only was Brehm's conduct "self-evidently criminal" so as to thwart the argument that his prosecution was fundamentally unfair, but the employment contract "constituted notice of the [United States' criminal jurisdiction under its agreement with the Afghan government] sufficient to dispel any surprise."    See id.

12

Along similar lines, the D.C. Circuit has recognized that "a treaty may provide notice sufficient to satisfy due process." See Ali, 718 F.3d at 945. More specifically, the court of appeals articulated that, when a treaty provides "global notice that certain generally condemned acts are subject to prosecution by any party to the treaty," the Fifth Amendment "demands no more." Id. at 944 (citing with approval United States v. Shi, 525 F.3d 709 (9th Cir. 2008)).

Relevant to Bello's prosecution in the United States, the IPP Convention provides that each signatory nation, or "State Party," must criminalize particular acts committed against an IPP, including kidnapping and murder. See IPP Convention, art. III, opened for signature Dec. 14, 1973, 28 U.S.T. 1975, 1035 U.N.T.S. 167. The Convention requires each State Party to "take such measures as may be necessary to establish its jurisdiction over [those] crimes," when "committed in the territory of that State" or when "committed against an [IPP] who enjoys his status as such by virtue of functions which he exercises on behalf of that State." Id. at art. III, ¶ 1. According to the Convention, the instrument itself may serve "as the legal basis for extradition" between two State Parties. Id. at art. VIII, ¶ 2. The Convention also specifies that the crimes of kidnapping and murdering an IPP "shall be treated, for the purpose of extradition between State Parties, as if [they] had

13

been committed not only in the place in which [they] occurred but also in the territories of the States required to establish their jurisdiction." Id. at art. VIII, ¶ 4.

The foregoing provisions of the IPP Convention give global notice that Colombia, as a State Party to the Convention, must establish jurisdiction over any kidnapping or murder of an IPP committed in its territory. Meanwhile, other State Parties (including the United States) must establish jurisdiction over the kidnappings and murders of their IPPs, wherever those crimes occur. When an IPP has been kidnapped or murdered in Colombia and the Colombian authorities have apprehended the alleged offender, the Convention affords Colombia the option of prosecuting him or extraditing him to the country that accorded the victim his IPP status. As suggested in Brehm and supported by decisions of our sister circuits, including Ali and Shi, that global notice alone is sufficient to quell any concern that Bello's prosecution in the United States for his crimes against Agent Watson contravened due process.

C.

Finally, we reject Bello's contention that because the United States Code provisions implementing the IPP Convention require knowledge of the victim's IPP status that Bello did not possess, those provisions cannot have put him on notice that he was subject to prosecution in this country. See Reply Br. of

14

Appellant 5 ("The fact that the statutes were never intended to reach Appellant's conduct informs the fact that he could not infer from the statutes that they could impact his conduct."). That argument fails at its start, in that the mens rea requirements of 18 U.S.C. § 1116(a) (the murder offense) and 18 U.S.C. § 1201(a)(4) (the object of the kidnapping conspiracy offense) are limited to the intent necessary for murder and kidnapping, and do not include the intent to victimize an IPP. The victim's IPP status is simply a "jurisdictional element" that allows prosecution of murder and kidnapping in our federal courts.

As the Supreme Court recently explained, courts generally "interpret criminal statutes to require that a defendant possess a <u>mens rea</u>, or guilty mind, as to every element of an offense." See <u>Luna Torres v. Lynch</u>, 136 S. Ct. 1619, 1630 (2016) (relying on <u>Elonis v. United States</u>, 135 S. Ct. 2001, 2009-10 (2015)). Not so, however, with respect to jurisdictional elements. <u>Id.</u> at 1631. That is, "when Congress has said nothing about the mental state pertaining to a jurisdictional element, the default rule flips: Courts assume that Congress wanted such an element to stand outside the otherwise applicable <u>mens rea</u> requirement." <u>Id.</u>; see <u>United States v. Cooper</u>, 482 F.3d 658, 664 (4th Cir. 2007) (observing that "mens rea requirements typically do not extend to the jurisdictional elements of a crime"). Our review

15

of §§ 1116(a) and 1201(a)(4) confirms that they are statutes where "the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal." See United States v. Feola, 420 U.S. 671, 676 n.9 (1975).[5]

## 1.

Section 1116(a) of Title 18, the statute underlying Count 1, provides that "[w]hoever kills or attempts to kill . . . [an IPP] shall be punished as provided under sections 1111, 1112, and 1113 of [Title 18]." Notably, § 1116(a) does not define "kill" or "attempt." Instead, those terms derive their meaning from §§ 1111, 1112, and 1113, which spell out the elements of the offenses of murder, manslaughter, and attempted murder or manslaughter, respectively, when committed "[w]ithin the special maritime and territorial jurisdiction of the United States." Section 1111, for example, specifies that "[m]urder is the unlawful killing of a human being with malice aforethought," and it distinguishes first- from second-degree murder. In other

---

[5] The government asserts that Bello's plea agreement bars him from pursuing his mens rea contention. See Br. of Appellee 27 (deeming mens rea contention to be "statutory interpretation argument" within Bello's waiver of right to appeal). Because Bello proffers the mens rea contention solely to support his Fifth Amendment claim, however, it is proper for us to reach — and reject — that argument today.

16

words, § 1111 identifies the substantive elements of murder, including the mental state required to commit that offense. See United States v. Ashford, 718 F.3d 377, 384 (4th Cir. 2013) (explaining that first-degree murder under § 1111 requires "premeditation," while second-degree murder requires simply "malice aforethought" (internal quotation marks omitted)).

Read in concert with § 1111, § 1116 confers jurisdiction over the murder of an IPP, including that of an American IPP in another country. See 18 U.S.C. § 1116(c) (providing, in pertinent part, that "the United States may exercise jurisdiction over the" murder of an IPP "outside the United States" if "the victim is a representative, officer, employee, or agent of the United States"). The victim's IPP status is thus clearly intended to be a jurisdictional element of the murder offense. And nothing in § 1116(a) rebuts the presumption that a perpetrator need not know his victim's status in order to commit the crime of murdering an IPP. Cf. Feola, 420 U.S. at 684 (concluding that a statute making it a federal crime to assault a federal officer merely required "an intent to assault, not an intent to assault a federal officer").

2.

Bello was charged in Count 3 with the conspiracy offense defined in 18 U.S.C. § 1201(c), which provides that, "[i]f two

17

or more persons conspire to violate [§ 1201] and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished" as provided by law. As relevant here, § 1201(a)(4) punishes "[w]hoever unlawfully . . . kidnaps . . . and holds for ransom or reward or otherwise any person," when that person is an IPP. As such, § 1201 criminalizes a conspiracy to kidnap an IPP.

Unlike § 1116(a), which cross-references and draws on other sections of Title 18, § 1201(a) spells out the "essential elements" of the substantive kidnapping offense, that is, "an unlawful seizure and holding" of another person. See United States v. Lewis, 662 F.2d 1087, 1088 (4th Cir. 1981). Satisfying the elements of § 1201(a), we have observed, "necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." See United States v. Lentz, 383 F.3d 191, 201 (4th Cir. 2004) (emphasis and internal quotation marks omitted). In other words, the elements of the kidnapping offense include a mens rea requirement. Those elements do not, however, require a perpetrator to know the circumstances that bring a kidnapping offense within the purview of the federal courts, such as whether the victim was an IPP.

Assessing the kidnapping statute as a whole confirms that the IPP provision — codified in 18 U.S.C. § 1201(a)(4) — is a

18

jurisdictional element of the kidnapping offense. See Wayne R. LaFave, 3 Subst. Crim. L. § 18.2(a) (2d ed. 2003) (describing § 1201(a)(4) as one of the "statutorily-declared bases for federal jurisdiction under the kidnapping statute"). That is, § 1201(a)(4)'s statutory neighbors speak in terms of jurisdiction, supporting the proposition that § 1201(a)(4) is also jurisdictional. See United States v. Atl. Research Corp., 551 U.S. 128, 135 (2007) (reading proximate statutory subparagraphs as bearing on one another's meaning because "[t]he provisions are adjacent and have remarkably similar structures"). More specifically, § 1201(a)(1) criminalizes a kidnapping offense that implicates "interstate or foreign commerce." Section 1201(a)(2) refers to a kidnapping committed "within the special maritime and territorial jurisdiction of the United States." Section 1201(a)(3) punishes a kidnapping "within the special aircraft jurisdiction of the United States." Finally, § 1201(a)(5) criminalizes the kidnapping of a federal officer. Each of the four subparagraphs surrounding § 1201(a)(4) confers federal jurisdiction without altering the substantive elements of the kidnapping offense. See Lewis, 662 F.2d at 1090 (concluding that pre-IPP Convention version of § 1201(a) "creates a single crime with four jurisdictional bases rather than four different crimes").

As with 18 U.S.C. § 1116(a), we discern no indication that Congress intended in § 1201(a)(4) to impose an additional mens rea requirement.  Rather, it is clear that a victim's IPP status is merely a basis for jurisdiction in our federal courts over a kidnapping offense, and that a perpetrator need not know of that status in order to be in violation of § 1201(a)(4) or to engage in a kidnapping conspiracy in contravention of § 1201(c). Accordingly, there is no merit to Bello's mens rea contention — nor his broader claim that the Fifth Amendment's Due Process Clause precluded his prosecution in this country — and we must uphold his kidnapping conspiracy and murder convictions.

## III.

Pursuant to the foregoing, the judgment of the district court is affirmed.

AFFIRMED